## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| Dakota Labs Inc., )<br><br>Plaintiff, )<br><br>v. )<br><br>Huron Capital Partners LLC and Michael Grunza III, )<br><br>Defendants. ) | Case No.: 2:24-cv-10922<br><br>Complaint and Demand for Jury Trial |

### COMPLAINT

Plaintiff Dakota Labs Inc. ("Dakota Labs"), for its Complaint and Demand for Jury Trial against Defendants Huron Capital Partners LLC ("Huron Capital") and Michael Grunza III ("Grunza"), by and through its attorneys, alleges as follows:

### NATURE OF THIS ACTION

1.      This is an action to remedy Huron Capital's wrongful misuse of its subsidiary, M7D Corporation d/b/a WD Lab Grown Diamonds ("WD Labs"), to obtain Dakota Labs' services with no intention of paying. It was aided in that fraud by Michael Grunza III, a Huron Capital partner who also served on WD Labs' board of directors and as its Chief Executive Officer. Huron Capital then shut down WD Labs and within weeks started another nearly identical alter ego, WD Advanced Materials LLC, also headed by Grunza. But it did not compensate Dakota Labs. Huron Capital's wrongdoing extends beyond a breach of contract—it and Grunza fraudulently induced Dakota Labs to enter into the contract in the first place. Justice requires piercing the corporate veil and holding Huron Capital directly responsible for the unjust losses that Dakota Labs has suffered as a result of the actions that Huron Capital caused WD Labs to take.

2.     WD Labs operated as a mere instrumentality of Huron Capital, subject to its total control. Almost every board member, including Grunza, was a Huron Capital partner or principal.

3.     WD Labs produced lab-grown diamonds that required further manufacture and polishing services. It induced Dakota Labs to enter into a "Collaboration Agreement," attached as Exhibit A, to manufacture and polish lab-grown diamonds on its behalf—demanding that Dakota Labs significantly expand its facilities and purchase additional machinery to do so. It agreed to make monthly payments to Dakota Labs to help defray those capital expenditures, to provide a minimum average amount of diamonds to process, and (of course) to pay the invoices for those processing services.

4.     But as Huron Capital and Grunza well knew, WD Labs did not have the money to pay for the services it asked Dakota Labs to perform, and it had no reasonable prospect of being able to pay. It did not pay the monthly charges to offset the new facilities Dakota Labs had to build. And even when there was no hope of its being able to pay invoices for Dakota Labs' services, WD Labs continued to ship product for Dakota Labs to process anyway. No reasonable person could have thought that WD Labs would be able to pay for the services it was contracting for, and on information and belief WD Labs, Grunza, and Huron Capital knew this—they had absolutely no intention of paying Dakota Labs. On information and belief, Huron Capital and Grunza were sucking WD Labs dry of assets while causing it to incur liabilities, like the ones to Dakota Labs at issue in this case.

5.     After months of invoices for work already performed continued to go unpaid, Dakota Labs terminated its contract with WD Labs. Huron Capital's reaction was simply to cause WD Labs to declare bankruptcy before Dakota Labs could obtain the inevitable judgment against

it, having already raided its assets to start another Grunza-run alter-ego lab-grown diamond company.

## PARTIES

6.      Plaintiff Dakota Labs Inc. is a company incorporated pursuant to the laws of British Columbia, Canada with a principal place of business in Canada.

7.      Defendant Huron Capital Partners LLC is a limited liability company organized under the laws of the State of Michigan. At all relevant times, Huron Capital dominated WD Labs and used it as its alter ego.

8.      Defendant Michael Grunza is a partner at Huron Capital, a former board member and CEO of WD Labs, and a board member and CEO of WD Advanced Materials LLC. On information and belief, Grunza is domiciled in the State of Texas.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction over this action pursuant to 15 U.S.C. § 1332(a)(2) because the matter in controversy exceeds the sum or value of $75,000, exclusive of interests and costs, and is between a citizen of a State and a citizen of a foreign state. Dakota Labs is a citizen of Canada. On information and belief, Huron Capital is a citizen of Michigan and is not a citizen or subject of a foreign state. On information and belief, Michael Grunza is a citizen of Texas and is not a citizen or subject of a foreign state.

10.      Huron Capital is subject to personal jurisdiction in this District. Huron Capital has its principal place of business in the State of Michigan, it is organized under the laws of this State, and its affiliations with this States are so continuous and systematic as to render it essentially at home in this State. Huron Capital has also purposefully availed itself of the privilege of conducting activities in the State of Michigan by intentionally using WD Labs as its instrumentality from its offices in this State to harm Dakota Labs as described in this Complaint.

11.     Grunza is subject to personal jurisdiction in this District. Grunza has purposefully availed himself of the privilege of conducting activities in the State of Michigan by acting to cause Huron Capital to commit an intentional tort in this State as described in this Complaint.

12.     Venue is proper in this District under 28 U.S.C. § 1391(b) a substantial part of the events giving raise to the claim occurred in this District, and Defendants are subject to personal jurisdiction in this District.

## FACTUAL BACKGROUND

### I.     WD Labs was a mere instrumentality of Huron Capital.

13.     During the relevant periods in 2022 and 2023, WD Labs was in the business of growing lab-grown rough/uncut diamonds.  It was a majority-owned subsidiary of Huron Capital, which exercised complete and total control over it. Of WD Labs' six directors, five were partners or principals of Huron Capital, including Grunza. Grunza also served as its President and Chief Executive Officer. In reality, WD Labs was a mere instrumentality of Huron Capital.

14.     WD Labs was severely undercapitalized.  Indeed, by the time of its bankruptcy, it listed a little over $3 million in assets (much of which was in the form of accounts receivable owed to it) but more than $44.7 million in liabilities. No reasonable person could have believed that WD Labs could pay for the services for which it was contracting with Dakota Labs, and on information and belief its leadership (including Huron Capital and Grunza) did not expect to pay Dakota Labs for those services. Indeed, the Collaboration Agreement required the special approval of WD Labs' board. Grunza and the Huron Capital-controlled board of WD Labs nevertheless approved the Collaboration Agreement when no reasonable person could have believed that WD Labs was sufficiently capitalized to perform its obligations.

15.     When Dakota Labs requested financial information to assure itself that WD Labs would be able to pay, Grunza told Dakota Labs on or about April 4, 2023 that Dakota Labs had

nothing to be worried about because WD Labs was backed by Huron Capital (in which Grunza himself was a partner).

16. When Dakota Labs expressed consternation that WD Labs was not paying its invoices, WD Labs responded on April 14, 2023 with a proposed restructuring of their arrangement that involved an exchange of Huron Capital's equity, again emphasizing the lack of separation between WD Labs and its parent company, Huron Capital.

## II. Under Huron Capital and Grunza's control, WD Labs contracted with Dakota Labs to manufacture and polish lab-grown diamonds.

17. Dakota Labs is the lab grown diamond division of the HRA Group of Companies ("HRA Group"). The HRA Group is a manufacturer and distributor of rough and polished diamonds and diamond jewelry. The manufacturing company of the HRA Group is Crossworks Manufacturing Ltd. ("Crossworks"). Crossworks operates diamond polishing factories which it uses for its own purposes as well as for third parties.

18. Lab grown diamonds like the ones produced by WD Labs are grown in controlled laboratory environments using advanced technological processes that duplicate the conditions under which natural diamonds develop when they form beneath the Earth's crust. WD Labs uses a process called Chemical Vapor Deposition ("CVD") to grow its diamonds in a laboratory. Very generally, CVD involves placing a seed diamond in a vacuum chamber filled with heated hydrogen and carbon-containing gasses. At a certain temperature, the gas molecules are broken down and layers of crystallized carbon begin to form around the seed, growing a more substantial diamond.

19. The lab grown diamonds WD Labs produced in this way were in a rough and unpolished condition and were not useable in diamond jewelry or marketable to jewelry customers. Instead, a further process of manufacturing and polishing the diamonds is required to produce finished and polished diamonds that are ready for sale to customers.

20.     In or around 2021, WD Labs was searching for a North American facility to manufacture and process its diamonds. When lab grown diamonds are sent to factories abroad for manufacturing and polishing services, it usually takes 60 to 90 days before the finished product is returned to the supplier. WD Labs, by contrast, was interested in a facility which could turn around lab grown diamonds into finished product in as little as a week's time.

21.     Dakota Labs' parent company, Crossworks, operated two diamond polishing facilities: one large scale factory in Ho Chi Minh City, Vietnam (the "Vietnam Facility") and a small facility in Toronto, Ontario (the "Toronto Facility").  The Toronto Facility could be expanded to accommodate WD Labs' needs. The expenses and operating costs related to opening and operating such a facility, however, would provide little to no financial upside for Crossworks without further compensation. There was an opportunity, however, for a mutually beneficial agreement that would see WD Labs move a substantial portion of its manufacturing and polishing requirements to Crossworks' existing production facility in Vietnam. This would allow Crossworks to be in a financial position to establish and operate a North American facility to service WD Labs' specific needs. This opportunity would be pursued through Dakota Labs, incorporated in July 2022 to separate the lab grown diamond business from HRA Group's/Crossworks' natural diamond business.

22.     On September 1, 2022, WD Labs and Dakota Labs entered into the Collaboration Agreement to pursue this opportunity. Dakota Labs agreed to manufacture "Rough Product" diamonds received from WD Labs and produce "Finished Product" diamonds at both the Vietnam Facility and (once the expansion was complete) the Toronto Facility. Dakota Labs was responsible for the up-front costs of expanding and refurbishing the Toronto Facility, but the Collaboration Agreement provided that upon completion WD Labs would make monthly payments to reimburse

those capital expenditures based on a four-year amortization schedule (the "Toronto Equipment

Cost") and to cover monthly operating expenses (the "Toronto Monthly Cost").

23.     In particular, section 2.1 of the Collaboration Agreement provides:

**2.1     Establishment of Toronto Facility**

(a)     Subject to and in accordance with the provisions of this Agreement, Dakota Labs shall establish and, upon Completion, maintain and operate a fully functional diamond manufacturing facility at 365 Evans Avenue, Suite 609, Etiboke [*sic*], Ontario, Canada M8Z 1K2 (the "**Toronto Facility**") with the capacity to Manufacture Rough Products to Finished Products to the production capacity and standards set forth in Schedule A.

(b)     Dakota Labs shall be responsible for the up-front costs of establishing, maintaining, and operating the Toronto Facility. Dakota Labs shall also be solely responsible for the management, maintenance, and operation of the Toronto Facility.

(c)     The Parties Acknowledge and agree that Schedule A contains the standards and specifications for the Toronto Facility, including the projected output of Finished Product and the projected Toronto Equipment Cost. Dakota shall seek and obtain the written consent of WD Labs (such consent not to be unreasonably withheld or delayed) for any cost overruns of capital equipment that would result in the Toronto Equipment Costs being 3% or greater than as is set out in Schedule A.

(d)     As soon as reasonably practicable after the Completion of the Toronto Facility, Dakota Labs shall deliver notice to WD Labs confirming that the Completion of the Toronto Facility has occurred, which notice shall also include a statement setting forth the date of Completion and the Toronto Equipment Costs.

Schedule "A" to the Collaboration Agreement is a spreadsheet that includes, among other things,

the production capacity for the projected output of "Finished Product" diamonds at the Toronto

Facility.  Schedule "A" also includes an agreed upon projection of Dakota Labs' capital and

operating costs associated with its establishment, maintenance, and operations of the Toronto

Facility.

7

24.     With respect to Dakota Labs's compensation for the Toronto Facility, section 5.2 provides:

> **5.2     Toronto Facility Pricing and Adjustments**
>
> (a)     Commencing on the Completion of the Toronto Facility, WD Labs will begin paying monthly amounts equal to the Toronto Equipment Cost (as determined pursuant to Section 2.1(d)) plus the Toronto Monthly Cost (the "**Toronto Price**").

25.     The "Toronto Equipment Cost" is defined in section 1.1(i) of the Collaboration Agreement as "the monthly amortization of the capital expenditures incurred by Dakota Labs in connection with the Completion of the Toronto Facility on the basis of a four-year amortization schedule, a projection of which is set forth in Schedule A (designated as "Equipment Amortization") . . . ." Schedule A to the Agreement lists "Equipment Amortization" as $6,742.50 USD per month.

26.     The other component of the Toronto Price, the "Toronto Monthly Cost," is defined in section 1.1(j) of the Collaboration Agreement as "the monthly amount of US$102,675.83, consisting of Dakota Labs' estimate cost incurred in operating and maintaining the Toronto Facility, including rent, wages, shipping, insurance, electricity, and all other operating and maintenance expenses."

27.     In section 3.1(a), WD Labs agreed to deliver an average of 3,000 carats of Rough Product per month for processing to the Vietnam Facility. Section 3.2 provided that, once the Toronto Facility was completed, Dakota Labs would begin manufacturing Finished Product there up to the facility's production capacity (estimated at the time of contracting at 1,000 carats per month).

28.     The Collaboration Agreement further sets out the compensation to which Dakota Labs was entitled. With respect to Dakota Labs' services provided at the Vietnam Facility, section 5.1 provides that:

> **5.1     Vietnam Facility Pricing**
>
> Commencing on the Effective Date, and subject to section 3.1(b), the price for Finished Products Manufactured at the Vietnam Facility shall be US$60 per rough carat, calculated on the after polycrystalline diamond removal weight, as adjusted pursuant to the terms set forth in <u>Schedule B</u> (the "**Vietnam Price**").

29.     Pursuant to Schedule B of the Collaboration Agreement, WD Labs was to pay Dakota Labs based on the number of carats delivered to the Vietnam Facility in a month: if 3,000 or more carats were delivered, $60 per carat; if 5,000 or more carats were delivered, $58 per carat; if 7,000 or more carats were delivered, $56 per carat; if 9,000 or more carats were, $54 per carat; and if 11,000 or more carats were delivered, $52 per carat.

30.     However, pursuant to section 3.1(b) of the Collaboration Agreement, if WD Labs were to deliver less than the average 3,000 carats of Rough Product diamonds in any given month, the price per carat would be increased by half of the deficit expressed as a percentage up to a maximum of twenty percent.

31.     Section 5.3 provides that all invoices, both for processing and for recoupment of the capital expenditures associated with establishing the Toronto Facility, would be due on net thirty-day terms:

> **5.3     Payment Terms**
>
> The Vietnam Price and the Toronto Price shall be due and owing to Dakota Labs net thirty (30) days after Dakota Labs delivers an invoice to WD Labs and shall be payable in USD as directed by Dakota Labs. Nothing herein shall be deemed as an exclusive remedy to Dakota Labs for WD Labs' failure to pay.

32.     To ensure Dakota Labs recouped its investment, section 7.1 provides that the Collaboration Agreement was to continue "in full force and effect until the date that is four (4) years after Completion of the Toronto Facility." And while section 7.2(a) permitted early termination in the event of an uncured material breach (e.g., due to non-payment of invoices), section 7.3(a) made the entire remaining amount of the Toronto Equipment Cost plus six months of labor costs payable to Dakota Labs:

### 7.1     Term

Subject to the provisions of Section 7.2 hereof, the term of this Agreement shall commence on the Effective Date and shall continue in full force and effect until the date that is four (4) years after Completion of the Toronto Facility (the "**Term**"), unless otherwise terminated earlier.

### 7.2     Termination

This Agreement shall not be terminated at any time prior to the expiration of the Term except in accordance with the terms and conditions of this Section 7.2.

(a)     <u>Default</u>. This Agreement may be terminated by written notice by either Party if the other Party breaches any material provision of this Agreement and does not remedy such breach within sixty (60) days of written notice of breach unless such breach cannot be remedied within such sixty (60) day period, in which case such breach must be remedied as soon as reasonable diligence will permit.

* * *

### 7.3     Effects of Termination

In the event this Agreement is terminated pursuant to this Section 7.2:

(a)     WD Labs shall pay to Dakota Labs all amounts properly payable to it under the terms of the Agreement up to the date of Termination plus an amount equal to: (i) the aggregate Toronto Equipment Cost for the remainder of the Term; and (ii) six (6) months of labour costs at the Toronto Facility; and

* * *

10

33.     In summary, at the direction of Huron Capital, WD Labs induced Dakota Labs to agree to renovate the Toronto Facility, purchase machinery, and pay the staff on the promise that WD Labs would pay it $109,417 per month for the Toronto Facility (the Toronto Monthly Cost plus the Toronto Equipment Cost), *plus* approximately $180,000 per month (3,000 carats at $60/carat) in processing at the Vietnam Facility. That is, Huron Capital and Grunza caused Dakota Labs to make significant expenditures on the (ultimately vain) promise of more than $289,000 per month in revenue for four years—all with the intention of paying nothing.

### III.    Dakota Labs completed the Toronto Facility in accordance with the Collaboration Agreement.

34.     In accordance with section 2.1 of the Agreement, Dakota Labs took steps to establish and operate the Toronto Facility.  This included:

(a)     Entering into a five year lease for the unit next door to the previously existing facility (in addition to the current space);

(b)     Acquiring a variety of equipment, as described in Schedule A to the Collaboration Agreement, required for the polishing and manufacture of Rough Product into Finished Product;

(c)     Hiring or relocating approximately 10 staff members to work at the Toronto Facility;

(d)     Performing tenant improvements, renovations, and furnishing the Toronto Facility, including IT and security systems.

35.     The Toronto Facility was completed on or about January 16, 2023, and it began manufacturing and polishing rough product diamonds as of this date. Dakota Labs accordingly sent the notice of Completion of the Toronto Facility to WD Labs on or about January 16, 2023.

### IV.    Dakota Labs also upgraded the Vietnam Facility in reliance on WD Labs' promises.

36.     WD Labs was required to provide an average of 3,000 carats of Rough Product diamonds (the "Average Monthly Amount") for production at Dakota Labs' Vietnam Facility pursuant to Section 3.1 of the Agreement.

37.     Prior to entering into the Agreement, and on a number of occasions subsequently, WD Labs represented to Dakota Labs that it would gradually be increasing the amount of carats it delivered monthly until it reached a total of 11,000 to 12,000 carats delivered to Dakota Labs each month. WD Labs expected to deliver these quantities as early as October 2023. For example, at an August 18, 2022 meeting near Washington, D.C. (before the Collaboration Agreement was signed), WD Labs' Chief Operating Officer, Caleb Woods, told Itay Ariel and Aaron Ariel of HRA Group that WD Labs wanted them to plan for a monthly production of 6,000 carats by the first quarter of 2023 and 11,000 carats by the end of the fourth quarter. In another conversation on March 8, 2023—while (unbeknownst to Dakota Labs) WD Labs was already unable to pay for orders it was submitting to Dakota Labs—Woods reiterated WD Labs' promises, telling Itay and Aaron Ariel that WD Labs expected to process 12,000 carats by October 2023. WD Labs was aware that these larger amounts it expected to deliver under the Collaboration Agreement would require an expansion of the Vietnam Facility, and it made these representations to induce Dakota Labs to undertake that expansion. On information and belief, Grunza directed Woods to make these representations to induce Dakota Labs to undertake that expansion.

38.     Based on the Average Monthly Amount alone, Dakota Labs expected the quantity of Rough Product diamonds Dakota Labs would be receiving each month for manufacturing and polishing services to be in volumes that significantly exceeded the pre-agreement production capacity of the Vietnam Facility.  Consequently, in reliance on WD Labs' contractual obligation, Dakota Labs invested substantial capital to expand the operations of the Vietnam Facility.

39.     To handle the Average Monthly Amount, Dakota Labs was required to obtain additional staff, equipment, and consumable materials necessary to the manufacturing and polishing process. With regards to the equipment, these included, for example, a Konfidi Trip'Ex

Green laser room, a number of bruting wheels, a Sarine DiaExpert planning system and other essential machines, tools and products for Dakota Labs' manufacturing and polishing process.

40.     Dakota Labs incurred significant costs to perform the above-described upgrades to the Vietnam Facility. Those costs, incurred in reliance on WD Labs' commitments, exceeded $990,000.

**V.     WD Labs did not pay Dakota Labs for of its capital expenditures or the invoices issued under the contract.**

41.     In or around January 2023, WD Labs began providing Rough Product diamonds to Dakota Labs. For the period of January to May 2023, Dakota Labs received the following amounts of carats from WD Labs for manufacturing and polishing and allocated them to its Toronto and Vietnam facilities approximately as follows:

| Month | Carats Received for Toronto Facility | Carats Received for Vietnam Facility | Total Carats |
|---|---|---|---|
| January 2023 | 500 | 5,260.95 | 5,760.95 |
| February 2023 | 1,000 | 3,107.28 | 4,107.28 |
| March 2023 | 1,000 | 3,101.35 | 4,101.35 |
| April 2023 | 0 | 0 | 0 |
| May 2023 | 1,000 | 3,016.81 | 4,016.81 |

42.     Dakota Labs processed these diamonds as required by the Collaboration Agreement.

43.     In accordance with Section 5.3 of the Agreement, Dakota Labs delivered invoices to WD Labs for its services at the Vietnam Facility, together with its monthly invoices of the Toronto Price for its services at the Toronto Facility. The amounts invoiced by Dakota Labs were due and owing thirty days following the delivery of each invoice.

13

44.     Dakota Labs issued the following invoices to WD Labs in respect of the Toronto Facility, which were not paid:

| Invoice No. | Date | Due Date | Total (USD) |
| --- | --- | --- | --- |
| 32431 | 02/28/2023 | 03/30/2023 | $110,000.00 |
| 32553 | 03/31/2023 | 04/30/2023 | $110,000.00 |
| 32620 | 04/30/2023 | 05/30/2023 | $110,000.00 |
| 32755 | 05/31/2023 | 06/30/2023 | $110,000.00 |
| 32859 | 06/30/2023 | 07/30/2023 | $110,000.00 |
| 32990 | 07/31/2023 | 08/30/2023 | $111,000.00 |
| 33081 | 08/31/2023 | 09/30/2023 | $111,000.00 |

45.     Dakota Labs issued the following invoices to WD Labs in respect of its manufacturing   services at the Vietnam Facility, which were not paid:

| Invoice No. | Date | Due Date | Total (USD) |
| --- | --- | --- | --- |
| 32432 | 02/28/2023 | 03/30/2023 | $64,438.72 |
| 32469 | 03/17/2023 | 04/16/2023 | $62,518.75 |
| 32580 | 04/18/2023 | 05/18/2023 | $61,965.40 |
| 32700 | 05/17/2023 | 06/16/2023 | $132,487.79 |
| 32746 | 06/07/2023 | 07/07/2023 | $95,995.77 |
| 32754 | 05/31/2023 | 06/30/2023 | $102,666.48 |
| 32897 | 07/11/2023 | 08/10/2023 | $261,339.18 |
| 32993 | 08/03/2023 | 09/02/2023 | $120,845.51 |
| 33109 | 09/14/2023 | 10/14/2023 | $189,528.48 |

46.     In breach of the Collaboration Agreement, WD Labs did not pay any of these invoices issued by Dakota Labs, despite demand. It made only token payments on unrelated invoices as a delaying tactic.

47.     As alleged above, when Dakota Labs requested financial information to assure itself that WD Labs would be able to pay, Grunza told Aaron Ariel over the phone on or about April 4, 2023 that Dakota Labs had nothing to be worried about because WD Labs was backed by

Huron Capital, which he described as a large private equity firm. Grunza further told Aaron Ariel that they still had liquidity available through a loan facility.

48. On May 5, 2023, Woods told Itay Ariel by text message that WD Labs had approved payment to Dakota Labs, and payment would be made the following week. No payment arrived.

49. On May 13, 2023, Woods told Itay Ariel by text message that WD Labs had agreed that payment would arrive "at the latest" by May 15, 2023. No payment arrived.

50. In text messages on May 15, 2023 and May 17, 2023, Woods assured Itay Ariel that payment would come within a week. No payment arrived.

51. On information and belief, Grunza directed Woods to make these representations.

52. On information and belief, Huron Capital and Grunza were simply playing for time, misrepresenting WD Labs' financial health and willingness to pay for work that Dakota Labs was doing while they prepared to transfer WD Labs' assets to a new alter ego in order to deprive Dakota Labs of the ability to recoup its losses from WD Labs directly.

53. In breach of the Agreement, WD Labs did not provide any additional carats of Rough Product diamonds to Dakota Labs since May 2023.

## VI.    Huron Capital caused WD Labs to declare bankruptcy to funnel its assets into an almost identical venture without having to compensate Dakota Labs.

54. On May 17, 2023, Dakota Labs wrote to WD Labs and provided written notice that WD Labs was in material breach of the Agreement, both with respect to the unpaid invoices and WD Labs' failure to provide Dakota Labs with any lab grown diamonds for April 2023.

55. Dakota Labs and WD Labs engaged in various commercial discussions regarding the Agreement thereafter in an attempt to address WD Labs' non-performance. However, WD Labs took no steps to remedy the breaches of the Agreement identified by Dakota Labs and no resolution was reached.

56.     Consequently, Dakota Labs filed a notice of arbitration in British Columbia, Canada on July 7, 2023, and on September 20, 2023, Dakota Labs issued a written termination notice to WD Labs pursuant to section 7.2 of the Collaboration Agreement. At that point, there were 40 months remaining on the term of the Collaboration Agreement. Under section 7.3, Dakota Labs was entitled to all of its outstanding invoices (more than $1.8 million), the aggregate Toronto Equipment Cost for the remainder of the term ($269,700), and six months of labor costs at the Toronto Facility ($345,000). Those remedies were non-exclusive, and so Dakota Labs also sought its lost profits expected under the Collaboration Agreement and its reliance damages for its capital expenditures on the Vietnam Facility, plus interest and the costs of arbitration.

57.     WD Labs had absolutely no defense to that liability. Judgment against it was a foregone conclusion. But Huron Capital had a plan to avoid its alter ego's liability—have it declare bankruptcy and open a new alter ego company with the same leadership to do much the same thing, with Grunza still at the helm.

58.     Thus, on October 10, 2023—less than a month after Dakota Labs terminated the Collaboration Agreement—Grunza and WD Labs's Board of Directors voted to approve a Chapter 7 bankruptcy petition, which was filed the next day. Five of the six board members who voted on that resolution were partners or principals of Huron Capital.

59.     Bare weeks later, on November 1, 2023, one of Huron Capital's co-investors in WD Labs announced that it was launching WD Advanced Materials LLC. *See* https://www.prnewswire.com/news-releases/wd-advanced-materials-llc-ushers-in-a-new-era-in-diamond-innovation-with-company-launch-301974405.html. That news release expressly stated that WD Advanced Materials "was formed following the transition from its predecessor gemstone manufacturing entity, WD Lab Grown Diamonds," i.e., the full name of WD Labs. It identified

Grunza, WD Labs' Chief Executive Officer and one of the Huron Capital partners who previously sat on WD Labs's Board and voted it into bankruptcy, as the acting Chief Executive Officer of this "new entity." It identified WD Labs' Chief Technology Officer, John Ciraldo, as WD Advanced Materials' Chief Technology Officer. It described WD Advanced Materials as a "market leader in Chemical Vapor Deposition (CVD) diamond growth, with headquarters in the Washington, D.C. area"—the exact same technology used by WD Labs and headquartered in the same place.

60.     On information and belief, the sole reason for the creation of WD Advanced Materials was to allow Huron Capital to continue to profit from its CVD lab-grown diamond business while using the U.S. Bankruptcy Code to shed the liabilities incurred by its previous CVD-focused alter ego, WD Labs, including indisputable liabilities to Dakota Labs that Huron Capital and Grunza caused WD Labs to incur. It is the same business with mostly the same people in control and almost the same name. On its website, WD Advanced Materials has a logo that actually incorporates WD Labs's name: WD Lab Grown Diamonds. https://www.wdadvancedmaterials.com/advanced-materials-2.

61.     On information and belief, Huron Capital and Grunza caused WD Labs to deliver lab-grown diamonds to Dakota Labs for processing without any intention of paying the resulting invoices to keep the illusion of its alter ego's solvency alive while it quietly funneled sufficient resources to co-investors and other insiders to permit WD Advanced Materials to be launched in its place.

62.     Justice requires piercing the corporate veil and holding Huron Capital liable for its alter ego's activities.

63.     Justice requires holding Grunza personally liable for torts he personally committed and directed others to commit on behalf of WD Labs and Huron Capital.

**COUNT I**

***Alter Ego Liability for Breach of Contract***
**(*Against Huron Capital*)**

64.     Dakota Labs incorporates each and every allegation of paragraphs 1 through 63 by reference as if fully set forth herein.

65.     At all relevant times, WD Labs was a mere instrumentality of Huron Capital.

66.     The Collaboration Agreement is a valid contract between WD Labs and Dakota Labs.

67.     Under the Collaboration Agreement, WD Labs was obligated to deliver minimum quantities of Rough Product diamonds to Dakota Labs for processing and to pay invoices on that processing on net 30 terms. WD Labs was further obligated to begin paying monthly amounts equal to the Toronto Equipment Cost and the Toronto Monthly Cost on completion of the Toronto Facility. The Collaboration Agreement was to continue in full force and effect for four years after the completion of the Toronto Facility.

68.     Dakota Labs had a reasonable expectation of profits from the Collaboration Agreement based on the minimum quantities of Rough Product diamonds that WD Labs was obligated to deliver for the full term of the Collaboration Agreement. Such profits were within the contemplation of the parties at the time they entered into Collaboration Agreement.

69.     Dakota Labs reasonably relied on WD Labs' representations about the quantities of Rough Product diamonds it intended to deliver for processing under the Collaboration Agreement in expanding the capabilities of the Vietnam Facility. WD Labs made those representations to induce Dakota Labs to expand its Vietnam Facility to meet its obligations under the Collaboration Agreement. Dakota Labs' need to expand the Vietnam Facility to meet its obligations under the

Collaboration Agreement was within the contemplation of the parties at the time they entered into Collaboration Agreement.

70.     Dakota Labs performed all of its obligations under the Collaboration Agreement, and all conditions precedent to WD Labs's obligations were satisfied.

71.     At Huron Capital's improper direction, WD Labs breached material provisions of the Collaboration Agreement by failure to deliver minimum quantities of Rough Product diamonds to Dakota Labs, failure to pay invoices for manufacturing and processing Rough Product into Finished Product when due, and failure to pay invoices for the Toronto Equipment Cost and the Toronto Monthly Cost when due.

72.     Dakota Labs provided proper written notice of those material breaches to WD Labs on or about May 17, 2023.

73.     WD Labs failed to remedy those breaches within 60 days of Dakota Labs' written notice of them.

74.     Dakota Labs rightfully terminated the Collaboration Agreement following WD Labs's failure to remedy its material breaches within sixty days of Dakota Labs' notice.

75.     Following Dakota Labs's termination of the Collaboration Agreement, WD Labs was obligated to pay all amounts properly payable to Dakota Labs up to the date of termination, plus the aggregate Toronto Equipment Cost for the remainder of the term and six months of labor costs at the Toronto Facility.

76.     Huron Capital bears full responsibility for these wrongful acts. The Huron Capital personnel who exercised complete control over WD Labs and used it as a mere instrumentality of Huron Capital caused WD Labs to breach the Collaboration Agreement by failing to deliver the promised minimum quantities of Rough Product diamonds for processing, failing to pay invoices

for manufacturing and processing Rough Product into Finished Product when due, failing to pay invoices for the Toronto Equipment Cost and the Toronto Monthly Cost when due, and failing to pay the amounts due on terminations of the Collaboration Agreement, including all amounts properly payable to Dakota Labs up to the date of termination, plus the aggregate Toronto Equipment Cost for the remainder of the term and six months of labor costs at the Toronto Facility.

77.    At Huron Capital's improper direction, WD Labs' breach of the Collaboration Agreement caused Dakota Labs to incur expectation damages in the form of amounts due under the Collaboration Agreement that WD Labs did not pay.

78.    At Huron Capital's improper direction, WD Labs's breach of the Collaboration Agreement caused Dakota Labs to incur expectation damages in the form of lost profits from the Collaboration Agreement based on the minimum quantities of Rough Product diamonds that WD Labs was obligated to deliver for the full term of the Collaboration Agreement.

79.    At Huron Capital's improper direction, WD Labs's breach of the Collaboration Agreement caused Dakota Labs to incur reliance damages in the form of capital expenditures to expand its Vietnam Facility to meet its obligations under the Collaboration Agreement.

80.    Huron Capital used WD Labs to commit a fraud or wrong on Dakota Labs by causing WD Labs to breach the Collaboration Agreement and then declare bankruptcy before reopening substantially the same business as a separate alter-ego legal entity.

81.    Dakota Labs suffered an unjust loss or injury as a result of Huron Capital's acts because it is unable to recover the damages Huron Capital caused to be inflicted on it through breach of the Collaboration Agreement without disregard of WD Labs' and Huron Capital's separate legal existence.

## COUNT II

### *Alter Ego Liability for Fraud in the Inducement*
### (*Against Huron Capital*)

82.     Dakota Labs incorporates each and every allegation of paragraphs 1 through 63 by reference as if fully set forth herein.

83.     At all relevant times, WD Labs was a mere instrumentality of Huron Capital.

84.     At Huron Capital's improper direction, WD Labs made several material representations to Dakota Labs knowing them to be false or in reckless disregard of their truth.

(a)     It represented to Dakota Labs that it intended to increase the volume of its orders to 11,000 to 12,000 carats by the end of October 2023, despite knowing at the time that it had no intention of doing so.

(b)     It entered into the Collaboration Agreement, despite knowing at the time that it had no intention of performing its obligations under that contract.

(c)     It delivered diamonds for processing in February 2023, despite knowing at the time that it had no intention of paying for that processing.

(d)     It delivered diamonds for processing in March 2023, despite knowing at the time that it had no intention of paying for that processing.

(e)     It delivered diamonds for processing in May 2023, despite knowing at the time that it had no intention of paying for that processing.

85.     At the time WD Labs made these representations, it and Huron Capital intended for Dakota Labs to act on them. Huron Capital's actions were intentional, malicious, willful and wanton.

86.     Dakota Labs acted in reasonable reliance on these representations, expanding its Vietnam Facility beyond what was required by the Collaboration Agreement, signing the Collaboration Agreement, and processing the diamonds delivered to it.

87.     Dakota Labs was harmed by its reliance on these representations.

88.     Dakota Labs is entitled to its attorney's fees as a result of WD Labs' fraudulent or unlawful conduct.

89.     Huron Capital used WD Labs to commit a fraud or wrong on Dakota Labs by causing WD Labs to make the above fraudulent representations and then declare bankruptcy before reopening substantially the same business as a separate alter-ego legal entity.

90.     Dakota Labs suffered an unjust loss or injury as a result of Huron Capital's acts because it is unable to recover the damages Huron Capital caused to be inflicted on it through breach of the Collaboration Agreement without disregard of WD Labs' and Huron Capital's separate legal existence.

## COUNT III

### *Fraud in the Inducement*
### (*Against Grunza*)

91.     Dakota Labs incorporates each and every allegation of paragraphs 1 through 63 by reference as if fully set forth herein.

92.     Grunza's directed WD Labs to make several material representations to Dakota Labs knowing them to be false or in reckless disregard of their truth.

(a)     It represented to Dakota Labs that it intended to increase the volume of its orders to 11,000 to 12,000 carats by the end of October 2023, despite knowing at the time that it had no intention of doing so.

(b)     It entered into the Collaboration Agreement, despite knowing at the time that it had no intention of performing its obligations under that contract.

(c)     It delivered diamonds for processing in February 2023, despite knowing at the time that it had no intention of paying for that processing.

(d)     It delivered diamonds for processing in March 2023, despite knowing at the time that it had no intention of paying for that processing.

(e)     It delivered diamonds for processing in May 2023, despite knowing at the time that it had no intention of paying for that processing.

93.     At the time WD Labs made these representations, Grunza intended for Dakota Labs to act on them.

94.     Grunza directed WD Labs' to sign the Collaboration Agreement knowing at the time that WD Labs had no intention of performing its obligations under that contract or in reckless disregard of that fact and intending for Dakota Labs to rely on those promises.

95.     Grunza represented to Dakota Labs that WD Labs' debts to it were backed by Huron Capital, knowing that statement to be false or in reckless disregard of its truth and intending for Dakota Labs to rely on that representation.

96.     Grunza directed Woods to represent that WD Labs had approved payment for overdue invoices, knowing that statement to be false or in reckless disregard of its truth and intending for Dakota Labs to rely on that representation.

97.     Grunza directed Woods to represent that WD Labs would pay overdue invoices, knowing that statement to be false or in reckless disregard of its truth and intending for Dakota Labs to rely on that representation.

98.     Dakota Labs acted in reasonable reliance on these representations, expanding its Vietnam Facility beyond what was required by the Collaboration Agreement, signing the Collaboration Agreement, processing the diamonds delivered to it, and refraining from seeking immediate relief from WD Labs before Huron Capital and Grunza caused it declare bankruptcy and reopened substantially the same business as a separate alter-ego legal entity. Grunza's actions were intentional, malicious, willful and wanton.

99.     Dakota Labs was harmed by its reliance on these representations.

100.    Dakota Labs is entitled to its attorney's fees as a result of Grunza's fraudulent or unlawful conduct.

## PRAYER FOR RELIEF

Wherefore, Dakota Labs prays that this Court enter judgment in its favor and against Huron Capital and Grunza as follows:

A.     An award of compensatory damages in an amount to be determined at trial, including but not limited to amounts due under the Collaboration Agreement, lost profits expected to be earned from the Collaboration Agreement, and reliance damages for capital expenditures to expand the Vietnam Facility;

B.     An award of pre- and post-judgment interest;

C.     An award of costs;

D.     An award of attorney's fees;

E.     Exemplary and/or punitive damages; and

F.     For any other relief the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Dakota Labs demands trial by jury in this action of all issues so triable.

Dated: April 9, 2024                     Respectfully submitted,

                                         WINSTON & STRAWN LLP


                                         /s/ Ronald Y. Rothstein
                                         Ronald Y. Rothstein
                                         RRothstein@winston.com
                                         35 West Wacker Drive
                                         Chicago, Illinois 60601
                                         +1 312-558-7464 Telephone

                                         Attorneys for Dakota Labs Inc.