# EXHIBIT A

<u>**COLLABORATION AGREEMENT**</u>

THIS **COLLABORATION AGREEMENT** (the "**Agreement**") is made the <u>1st</u> day of <u>September</u>, 2022 (the "**Effective Date**"),

BETWEEN:

    **M7D Corporation dba WD Lab Grown Diamonds**, a corporation with a principal place of business at 6710 Virginia Manor Road, Beltsville, Maryland 20705 USA

    ("**WD Labs**")

AND:

    **Dakota Labs Inc.**, as a general partner of Dakota Labs, a British Columbia general partnership with a principal place of business at 1501-3777 Kingsway, Burnaby BC V5H 3Z7

    ("**Dakota Labs**")

**WHEREAS:**

A.     WD Labs is engaged in the business of growing lab grown diamonds.

B.     Dakota Labs is a manufacturer and distributor of polished and rough diamonds.

C.     WD Labs wishes to retain Dakota Labs to provide services to manufacture and polish WD Labs' lab grown diamonds into polished diamonds.

D.     Dakota Labs has agreed to provide manufacturing and polishing services to WD Labs upon the terms and conditions set forth herein.

**NOW THEREFORE**, in consideration of the mutual covenants contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, WD Labs and Dakota Labs (collectively the "**Parties**") agree as follows:

**Article 1**
**Definitions**

**1.1**     **Definitions**

The following terms used in the Agreement shall have the meanings set forth below. Other terms of less general applicability are defined elsewhere in the Agreement where appropriate:

(a)     "**Average Monthly Amount**" means the average amount on a trailing three-month basis.

(b)     "**Completion**" in respect of the Toronto Facility shall be achieved when the establishment of the Toronto Facility is substantially completed in all material respects, except for any deficiencies which will not have a material effect on the production capacity and standards projected in <u>Schedule A</u>.

CW18539126.6

(c)  **"Finished Products"** means the finished and polished diamonds Manufactured by Dakota Labs using the Rough Product provided by WD Labs that are ready for sale to consumers;

(d)  **"Manufacture"** means all operations necessary to manufacture and polish the Rough Product into Finished Products in accordance with the Specifications and the terms and conditions of this Agreement.

(e)  **"Party"** means either Dakota Labs or WD Labs and **"Parties"** means both of them.

(f)  **"Rough Product"** means the unpolished lab grown diamonds grown by WD Labs.

(g)  **"Specifications"** mean the written specifications for Manufacturing pertaining to the Finished Products as provided by WD Labs to Dakota Labs as contemplated in Section 3.3.

(h)  **"Term"** has the meaning set forth in Section 7.1 hereof, subject to any earlier termination of this Agreement pursuant to Section 7.2 hereof.

(i)  **"Toronto Equipment Cost"** means the monthly amortization of the capital expenditures incurred by Dakota Labs in connection with the Completion of the Toronto Facility on the basis of a four-year amortization schedule, a projection of which is set forth in Schedule A (designated as "Equipment Amortization") and which shall be established pursuant to Section 2.1(d).

(j)  **"Toronto Monthly Cost"** means the monthly amount of US$102,675.83, consisting of Dakota Labs' estimate cost incurred in operating and maintaining the Toronto Facility, including rent, wages, shipping, insurance, electricity, and all other operating and maintenance expenses.

(k)  **"Toronto Facility"** has the meaning set forth out Section 2.1.

(l)  **"Vietnam Facility"** means the diamond manufacturing facility operated by Dakota Labs located at 20A Phan Van Tri Street, Ward 10, Go Vap District, Ho Chi Minh City, Vietnam

(m)  **"WD Labs' Facility"** means 6710 Virginia Manor Road, Beltsville, Maryland 20705 USA.

## Article 2
## Establishment of Toronto Facility

**2.1  Establishment of Toronto Facility**

(a)  Subject to and in accordance with the provisions of this Agreement, Dakota Labs shall establish and, upon Completion, maintain and operate a fully functional diamond manufacturing facility at 365 Evans Avenue, Suite 609, Etiboke, Ontario, Canada M8Z 1K2 (the "**Toronto Facility**") with the capacity to Manufacture Rough Products to Finished Products to the production capacity and standards set forth in Schedule A.

(b)  Dakota Labs shall be responsible for the up-front costs of establishing, maintaining, and operating the Toronto Facility. Dakota Labs shall also be solely responsible for the management, maintenance, and operation of the Toronto Facility.

(c)  The Parties acknowledge and agree that Schedule A contains the standards and specifications for the Toronto Facility, including the projected output of Finished Product and the projected

        Toronto Equipment Cost. Dakota Labs shall seek and obtain the written consent of WD Labs (such consent not to be unreasonably withheld or delayed) for any cost overruns of capital equipment that would result in the Toronto Equipment Costs being 3% or greater than as is set out in Schedule A.

(d)     As soon as reasonably practicable after the Completion of the Toronto Facility, Dakota Labs shall deliver notice to WD Labs confirming that the Completion of the Toronto Facility has occurred, which notice shall also include a statement setting forth the date of Completion and the Toronto Equipment Costs.

### Article 3
### Specifications and Manufacturing of Product

**3.1 Vietnam Facility**

(a)     Each month, commencing on the Effective Date, WD Labs will deliver to Dakota Labs an Average Monthly Amount of at least 3,000 carats of Rough Product.

(b)     If WD Labs delivers less than the Average Monthly Amount of 3,000 carats of Rough Product in any given month, the price per carat of Rough Product for such Average Monthly Amount shall be increased by half of the deficit (expressed as a percentage) up to a maximum of twenty percent (20%). By way of illustration, if WD Labs delivers an Average Monthly Amount of 2700 carats, resulting in a deficit of 300 carats of Rough Product (10% deficit), then the price per carat for such 2700 carats of Rough Product delivered shall be US$60 plus US$3 (being 5% of US$60).

**3.2 Toronto Facility**

(a)     Commencing on the date of Completion of the Toronto Facility, and during the Term, Dakota Labs shall Manufacture Finished Product at the Toronto Facility for WD Labs in accordance with the terms of this Agreement.

(b)     WD Labs acknowledges and agrees that the production capacity of Finished Product at the Toronto Facility as projected in Schedule A is dependent on the type, quantity, and proportions of Rough Product set forth therein. Any deviation from the type, quantity, and proportions of Rough Product may result in a deviation from the projected output of Finished Product and the Toronto Monthly Cost.

(c)     The Parties acknowledge and agree that Dakota Labs is not obligated to Manufacture Finished Product at the Toronto Facility exclusively for WD Labs. In the event Dakota Labs intends on Manufacturing finished and polished diamonds at the Toronto Facility for a party other than WD Labs, Dakota Labs shall give WD Labs 30 days' prior notice setting forth the total carat weight of the third-party Rough Product that will be Manufactured at the Toronto Facility. Upon delivery of such notice, the parties shall, in good faith, meet to discuss any required variations to the services provided by Dakota Labs pursuant to this Agreement and the fees for such services.

**3.3 Specifications and Manufacturing**

After receipt of Rough Product, Dakota Labs shall provide WD Labs a notice setting forth the specifications to which such Rough Product can be Manufactured into Finished Product. WD Labs shall, upon receipt of each such notice, confirm in writing with Dakota Labs its selection of the specification

for Manufacturing, which selection shall be the "Specifications" for the applicable Rough Product. Subject to Section 4.4, Dakota Labs shall Manufacture Finished Products in accordance with the Specifications.

Article 4
Shipment, Delivery, and Acceptance

4.1   **Shipment and Delivery of Rough Product; Risk of Loss**

   (a)   WD Labs shall arrange for the shipment and delivery of the Rough Product as follows:

   (i)   with respect to Rough Product to be Manufactured at the Vietnam Facility, to the facilities of Dakota Labs located in Vancouver, British Columbia, or Seattle, Washington, as directed by Dakota Labs; and

   (ii)   with respect to Rough Product to be Manufactured at the Toronto Facility, to the Toronto Facility.

   All packaging, shipping, handling and related import and export charges, insurance charges, taxes and duties, with respect to the shipment and delivery of the Rough Product, are the responsibility of WD Labs.

   (b)   WD Labs assumes the risk of loss, theft, or damage to the Rough Product until the Rough Product is delivered to the Dakota Labs in accordance with Section 4.1(a), after which risk of loss of the Rough Product passes to Dakota Labs.

   (c)   Prior to each deliver of Rough Product, WD Labs shall provide to Dakota Labs written confirmation specifying the quantity and type of Rough Product, along with the expected date of delivery of the Rough Product.

4.2   **Shipment and Delivery of Finished Product; Risk of Loss**

   (a)   Dakota Labs shall arrange for the shipment and delivery of the Finished Product to the WD Labs Facility. All packaging, shipping, handling and related import and export charges, insurance charges, taxes and duties, with respect to the shipment and delivery of the Finished Product, are the responsibility of Dakota Labs.

   (b)   Dakota Labs assumes the risk of loss, theft, or damage to the Finished Product until the Finished Product is delivered to the WD Labs Facility, after which risk of loss of the Finished Product passes to WD Labs.

4.3   **Title to Rough Product and Finished Product**

   Title to the Rough Product and Finished Product shall remain with WD Labs at all times.

4.4   **Variance from Specifications and for Breakage**

   WD Labs agrees that the Manufacturing of the Finished Product in accordance with the Specification depends on the quality and characteristics of the Rough Product. Accordingly, WD Labs acknowledges and agrees that any Finished Product that does not conform to the Specifications due to the inherent

quality and characteristics of the Rough Product shall not be considered a breach of Dakota Labs' obligations pursuant to this Agreement. Further, WD Labs acknowledges and agrees that up to 1% of the Polished Outcome may suffer breakage during the Manufacturing process.

## Article 5
## Pricing and Payment Terms

**5.1     Vietnam Facility Pricing**

Commencing on the Effective Date, and subject to Section 3.1(b), the price for Finished Products Manufactured at the Vietnam Facility shall be US$60 per rough carat, calculated on the after polycrystalline diamond removal weight, as adjusted pursuant to the terms set forth in Schedule B (the "**Vietnam Price**").

**5.2     Toronto Facility Pricing and Adjustments**

(a)     Commencing on the Completion of the Toronto Facility, WD Labs will begin paying monthly amounts equal to the Toronto Equipment Cost (as determined pursuant to Section 2.1(d)) plus the Toronto Monthly Cost (the "**Toronto Price**").

(b)     The Toronto Monthly Cost shall be adjusted as follows:

(i)     Once per year, beginning on the Completion of the Toronto Facility and each anniversary date thereafter, the Toronto Monthly Cost shall be adjusted by a percentage equal to the greater of:

A.     the average increase in the Consumer Price Index (CPI) – All Items over the prior 12-month period (provided that, the first such adjustment to occur on the Completion of the Toronto Facility shall only account for the average increase in the Consumer Price Index (CPI) – All Items over the period of time commencing on the Effective Date and ending on the date of Completion of the Toronto Facility); and

B.     three (3) percent.

In no event shall the price adjustment result in a downwards adjustment to the Toronto Monthly Cost.

**5.3     Payment Terms**

The Vietnam Price and the Toronto Price shall be due and owing to Dakota Labs net thirty (30) days after Dakota Labs delivers an invoice to WD Labs and shall be payable in USD as directed by Dakota Labs. Nothing herein shall be deemed as an exclusive remedy to Dakota Labs for WD Labs' failure to pay.

## Article 6
## Representation, Warranties, and Limitation of Liability

**6.1     Representations and Warranties**

(a)     <u>Dakota Labs</u>.  Dakota Labs hereby represents and warrants to WD Labs that:

- 6 -

    (i)    it is duly organized and validly existing and has full power and authority to enter into this Agreement and to perform its obligations hereunder;

    (ii)    it is duly authorized to execute and deliver this Agreement and to perform its obligations hereunder;

    (iii)    this Agreement is a legal and valid obligation binding upon Dakota Labs and enforceable in accordance with its terms; and

    (iv)    the execution, delivery and performance of this Agreement by Dakota Labs does not conflict with any agreement to which it is a Party or any law, regulation, rule, approval or permit to which it is subject.

(b)    <u>WD Labs</u>. WD Labs hereby represents and warrants to Dakota Labs that:

    (i)    it is duly organized and validly existing and has full power and authority to enter into this Agreement and to perform its obligations hereunder;

    (ii)    this Agreement is a legal and valid obligation binding upon WD Labs and enforceable in accordance with terms;

    (iii)    the execution, delivery and performance of this Agreement by WD Labs does not conflict with any agreement to which it is a Party or any law, regulation, rule, approval or permit to which it is subject; and

    (iv)    it has all licenses, permits, and other authorizations necessary to fulfill its obligations under this Agreement.

**6.2    Limitation of Liability**

IN NO EVENT SHALL DAKOTA LABS BE LIABLE FOR CONSEQUENTIAL, INDIRECT, INCIDENTAL, SPECIAL, EXEMPLARY, PUNITIVE, OR AGGRAVATED DAMAGES, ARISING OUT OF, OR RELATING TO, AND/OR IN CONNECTION WITH ANY BREACH OF THIS AGREEMENT, REGARDLESS OF:

(a)    WHETHER SUCH DAMAGES WERE FORESEEABLE;

(b)    WHETHER OR NOT DAKOTA LABS WAS ADVISED OF THE POSSIBILITY OF SUCH DAMAGES; AND

(c)    THE LEGAL OR EQUITABLE THEORY (CONTRACT, TORT, OR OTHERWISE) UPON WHICH THE CLAIM IS BASED.

**Article 7
Term and Termination**

**7.1    Term**

Subject to the provisions of Section 7.2 hereof, the term of this Agreement shall commence on the Effective Date and shall continue in full force and effect until the date that is four (4) years after Completion of the Toronto Facility (the "**Term**"), unless otherwise terminated earlier.

**7.2     Termination**

This Agreement shall not be terminated at any time prior to the expiration of the Term except in accordance with the terms and conditions of this Section 7.2.

(a) <u>Default</u>. This Agreement may be terminated by written notice by either Party if the other Party breaches any material provision of this Agreement and does not remedy such breach within sixty (60) days of written notice of breach unless such breach cannot be remedied within such sixty (60) day period, in which case such breach must be remedied as soon as reasonable diligence will permit.

(b) <u>Termination with Cause</u>.  Either Party may terminate this Agreement at any time effective upon delivery of written notice of such termination upon the occurrence of any of the following:

(i) improper assignment of this Agreement by the non-terminating Party; or

(ii) the non-terminating Party becomes insolvent or if the non-terminating Party becomes bankrupt within the meaning of the bankruptcy legislation applicable to the non-terminating Party, or if a petition in bankruptcy is filed by or against the non-terminating Party, or if any steps are taken to appoint a receiver, receiver-manager or other custodian (permanent or temporary) of the non-terminating Party's business or assets or any part thereof, or if any proceeding for a proposal with creditors is instituted by or against the non-terminating Party, or if the assets of the non-terminating Party are subject to seizure or execution or other analogous process, or if any steps are taken to effect the liquidation, dissolution or other reorganization of the non-terminating Party.

**7.3     Effects of Termination**

In the event this Agreement is terminated pursuant to this Section 7.2:

(a) WD Labs shall pay to Dakota Labs all amounts properly payable to it under the terms of the Agreement up to the date of Termination plus an amount equal to: (i) the aggregate Toronto Equipment Cost for the remainder of the Term; and (ii) six (6) months of labour costs at the Toronto Facility; and

(b) Dakota Labs shall return to WD Labs all Rough Product and Finished Product in its possession.

## Article 8
## Dispute Resolution

**8.1     Executive Resolution**

If any dispute arises between the Parties relating to the interpretation, breach or performance of this Agreement or the grounds for the termination thereof, the Parties agree that before submitting such dispute to arbitration as set forth in Section 8.2 below, the Parties shall, for a period of thirty (30) days, attempt in good faith to negotiate a resolution of the dispute (including, if agreed by the Parties, retaining a third party manufacturing consultant to provide a review and render a decision). The foregoing shall not be interpreted to preclude either Party from seeking and obtaining from the appropriate court provisional remedies such as attachment, preliminary injunction, etc. to avoid irreparable harm, maintain the status quo, or preserve the subject matter of the dispute.

**8.2     Arbitration**

All disputes arising out of or in connection with this Agreement, or in respect of any defined legal relationship associated therewith or derived therefrom, shall be referred to and finally resolved by arbitration under the International Commercial Arbitration Rules of Procedure of the British Columbia International Commercial Arbitration Centre. The panel shall consist of one arbitrator and the appointing authority shall be the British Columbia International Commercial Arbitration Centre. The case shall be administered by the British Columbia International Commercial Arbitration Centre in accordance with its Rules. The language of the arbitration shall be English. The place of arbitration shall be Vancouver, British Columbia, Canada. The decision of the arbitrator shall be binding upon both Parties and no appeal shall lie therefrom. Notwithstanding the above arbitration provision, nothing herein shall preclude either Party from applying to a Court of competent jurisdiction for an order enjoining any activity by the other Party pending the hearing of the arbitration.

**Article 9**
**Confidentiality**

**9.1     Confidential Information**

From time to time during the Term of this Agreement, either Party (as the "**Disclosing Party**") may disclose or make available to the other Party (as the "**Receiving Party**") information about its business affairs, products, services, confidential intellectual property, third-party confidential information and other sensitive, non-public or proprietary information, data, documents, agreements, files and other materials regarding or concerning and treated as confidential by the Disclosing Party or its affiliates, including all analyses, notes, compilations, reports, forecasts, studies, samples, statistics, summaries, interpretations and other documents prepared by the Receiving Party which contain or otherwise reflect or are generated from such information, data, documents, agreements, files or other materials (the "**Confidential Information**").

**9.2     Exclusions**

The term "Confidential Information" as used herein shall not include information that, at the time of disclosure:

(a)     is, or thereafter becomes, generally available to and known by the public other than as a result of its disclosure, directly or indirectly, in breach of this Article 9 by the Receiving Party or any of its representatives;

(b)     is, or thereafter becomes, available to the Receiving Party on a non-confidential basis from a third-party source, provided that such source was not prohibited from disclosing such Confidential Information to the Receiving Party by a legal, contractual or fiduciary obligation;

(c)     was already known by or in the possession of the Receiving Party, as established by documentary evidence, prior to being disclosed by or on behalf of the Disclosing Party;

(d)     has been independently developed by the Receiving Party as established by documentary evidence, without reference to or use of, in whole or in part, any of the Disclosing Party's Confidential Information; or

 (e) is required to be disclosed by law or valid court order issued by a court or governmental authority of competent jurisdiction.

**9.3** **Obligations of Confidentiality**

The Receiving Party shall:

 (a) keep the Confidential Information strictly confidential and protect and safeguard the confidentiality of the Disclosing Party's Confidential Information with at least the same degree of care as the Receiving Party would protect its own Confidential Information, but in no event with less than a commercially reasonable degree of care;

 (b) not use the Disclosing Party's Confidential Information, or permit it to be accessed or used, for any purpose other than to perform its obligations under this Agreement, or otherwise in any manner to the Disclosing Party's detriment;

 (c) without the prior written consent of the Disclosing Party, not disclose any such Confidential Information to any person or entity, except to the Receiving Party's representatives who need to know the Confidential Information to assist the Receiving Party, or act on its behalf, in exercising its rights or performing its obligations under this Agreement. The Receiving Party shall be responsible for any breach of this Article 9 caused by any of its representatives.

 (d) Upon the expiration or termination of the Agreement, the Receiving Party shall promptly return to the Disclosing Party all of the Disclosing Party's Confidential Information (including all copies, extracts, notes or other reproductions) whether in written, electronic or other form or media, or destroy all such Confidential Information and copies, extracts, notes or other reproductions thereof and certify in writing to the Disclosing Party that such Confidential Information has been destroyed.

**Article 10**
**General Provisions**

**10.1** **Taxes; Currency**

All prices quoted are exclusive of applicable federal, state and local excise, sales and use taxes. Any references to dollars or cents in this Agreement shall mean the currency of the United States of America.

**10.2** **Force Majeure**

 (a) Dakota Labs shall not be subject to any liability for delay in performance or non-performance hereunder as a result of contingencies and circumstances beyond its control (including, but not limited to, fire, flood, or other natural catastrophes, strike, labor trouble, riot, war, act of governmental authority, or act of God) interfering with the Manufacture, supply, transportation or receipt of Finished Product.

 (b) Except where the nature of the event shall prevent it from doing so, if Dakota Labs suffers such force majeure, it shall promptly notify WD Labs in writing after the occurrence of such force majeure and shall, in every instance, to the extent reasonable and lawful under the circumstances, use its commercially reasonable efforts to remove or remedy such cause with all reasonable dispatch.

### 10.3 Entire Agreement

This Agreement and all schedules hereto constitute the full understanding of the Parties, a complete allocation of risk between them, and a complete and exclusive statement of the terms and conditions of their Agreement relating to the Manufacture of Finished Product hereunder and supersedes and replaces any and all prior or contemporaneous agreements, arrangements, understandings, and negotiations, whether written or oral, that may exist between the Parties with respect to the subject matter hereof. No modification hereof shall be effected by the acknowledgement or acceptance of any purchase order or shipping instruction forms containing terms and conditions at variance with or in addition to those set forth in this Agreement.

### 10.4 Relations Between the Parties

The Parties acknowledge that no partnership, joint venture, or agency relationship is created between the Parties with respect to this Agreement.

### 10.5 Assignment

Neither this Agreement nor any claim arising directly or indirectly out of or in connection with this Agreement shall be assignable by the Parties hereto without the prior written consent of the other Party.

### 10.6 Notice

(a) All notices, requests, consents, claims, demands, waivers, and other communications under this Agreement (each, a "**Notice**"), must be in writing and addressed to the other Party at its address set forth below (or to such other address that the receiving Party may designate from time to time in accordance with this Section). Notices sent in accordance with this Section will be deemed effectively given: (a) when received, if delivered by hand, with signed confirmation of receipt; (b) when received, if sent by a nationally recognized overnight courier, signature required; and (c) when sent, if by or email (with confirmation of transmission), if sent during the addressee's normal business hours, and on the next business day if sent after the addressee's normal business hours.

If to **Dakota Labs**

1501-3777 Kingsway,
Burnaby, BC, Canada
V5H 3Z7

Email: rrothstein@hragroup.com
Attention: Reut Rothstein

If to **WD Labs**

6710 Virginia Manor Road,
Beltsville, Maryland
20705 USA

Email: Caleb Wood
Attention: caleb@wdlabgrowndiamonds.com

10.7    **Severability**

If any provision of this Agreement is found or declared to be invalid or unenforceable by any court or other competent authority having jurisdiction, such finding or declaration will not invalidate any other provision hereof and this Agreement shall thereafter continue in full force and effect, except that such invalid or unenforceable provision, and (if necessary) other provisions thereof, shall be reformed by a court of competent jurisdiction so as to effect, insofar as is practicable, the intention of the Parties as set forth in this Agreement, provided that if such court is unable or unwilling to effect such reformation, the invalid or unenforceable provisions shall be deemed deleted to the same extent as if it had never existed.

10.8    **Governing Law – Venue**

This Agreement shall be made and construed in accordance with the domestic laws of the Province of British Columbia and the laws of Canada applicable therein, excluding its conflict of laws rules. Subject to the arbitration provision set out in Article 8 herein, in the event of any dispute or other proceeding in respect of the Finished Products, this Agreement or any relationship arising between the Parties under this Agreement, the Parties hereby irrevocably submit to the exclusive jurisdiction of the Courts of the Province of British Columbia.

10.9    **Remedies**

No right or remedy herein conferred upon the Parties is intended to be exclusive of any other right or remedy, and each and every right or remedy shall be cumulative and in addition to any other right or remedy given hereunder or now or hereafter existing at law or in equity or by statute.

10.10    **Schedules**

The schedules to this Agreement are hereby incorporated in and made a part of this Agreement. The Parties may, by mutual consent, amend any schedule at any time during the term hereof by executing a version of such schedules dated after the then current version.

10.11    **Waiver/Amendment**

Any waiver by either Party hereto of a breach or a default of any provision of this Agreement by any other Party hereto, shall not be construed as a waiver of any succeeding breach of the same or any other provision, nor shall any delay or omission on the part of any Party hereto to exercise or avail itself of any right, power, or privilege that it has or may have hereunder, operate as a waiver of any such right, power, or privilege by such Party. Any amendment or supplementation of this Agreement shall be effective only if in writing, signed by both of the Parties hereto.

10.12    **Counterparts**

This Agreement may be executed in any number of counterparts, each of which shall be deemed an original but all of which together shall constitute one and same instrument. The Parties have agreed that for this purpose, facsimile signatures will be accepted as originals.

- 12 -

**IN WITNESS HEREOF**, the Parties have caused this Agreement to be executed by their duly authorized representatives as of the date first above written.

**M7D Corporation dba WD Lab Grown Diamonds**

Per: _____

Name: Caleb Wood
Title: Chief Operating Officer

**Dakota Labs Inc.**, as a general partner of the Dakota Labs, a general partnership

Per: _____
Name: Kent Rothstein
Title: Director

CW18539126.6

**SCHEDULE A**

**Projection**

See attached.

## SCHEDULE B

| Manufacturing PPC | Carats Per Month |
|---|---|
| $ 60.00 | 3,000 |
| $ 58.00 | 5,000 |
| $ 56.00 | 7,000 |
| $ 54.00 | 9,000 |
| $ 52.00 | 11,000 |