# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| Dakota Labs Inc.,          ) | |
|         ) | |
|      Plaintiff,    ) | Case No. 2:24-cv-10922 |
|         ) | |
|    v.        ) | Hon. Susan K. DeClercq |
|         ) | |
| Huron Capital Partners LLC and    ) | |
| Michael Grunza III,    ) | |
|         ) | |
|      Defendants.    ) | |
|         ) | |

# PLAINTIFF DAKOTA LABS INC.'S
# OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

# **TABLE OF CONTENTS**

**Page**

INTRODUCTION ...................................................................1

FACTUAL BACKGROUND.......................................................2

    I.    WD Labs was a mere instrumentality of Huron Capital...................2

    II.   Huron Capital and Grunza caused WD Labs to enter a contract they knew it would not perform and strung Dakota Labs along with a stream of falsehoods. ...............................4

    III.  Huron Capital caused WD Labs to declare bankruptcy, causing Dakota Labs to suffer an unjust loss.....................................7

    IV.  Defendants failed to comply with L.R. 7.1(a) before filing this motion. .................................................................9

ARGUMENT ......................................................................9

    I.    Michigan alter-ego claims do not belong to the bankruptcy trustee. ..........................................................10

    II.   Huron Capital is accountable for its alter ego's breach of contract. ..............................................................14

    III.  Dakota Labs adequately alleges each Defendant's fraud.................21

CONCLUSION ...................................................................25

i

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*All About Chores LLC v. Lyon*,
  2019 WL 2590750 (E.D. Mich. June 25, 2019) .................................................12

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)...........................................................................................21

*Berrington v. Wal-Mart Stores, Inc.*,
  696 F.3d 604 (6th Cir. 2012) .............................................................................14

*United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.*,
  501 F.3d 493 (6th Cir. 2007) .............................................................................22

*Cassirer v. Thyssen-Bornemisza Collection Found.*,
  596 U.S. 107 (2022)...........................................................................................11

*CH Holding Co. v. Miller Holding Co.*,
  973 F. Supp. 2d 733 (E.D. Mich. 2013) ............................................................13

*CH Holding Co. v. Miller Parking Co.*,
  903 F. Supp. 2d 551 (E.D. Mich. 2012) ............................................................13

*DBI Invs. LLC v. Blavin*,
  617 F. App'x 374 (6th Cir. 2015)..................................................................23, 24

*In re Direct Gen. Corp. Sec. Litig.*,
  398 F. Supp. 2d 888 (M.D. Tenn. 2005) ...........................................................17

*Doe v. Mich. State Univ.*,
  989 F.3d 418 (6th Cir. 2021) .............................................................................10

*Duby v. Shirley May's Place, LLC*,
  2017 WL 1021062 (E.D. Mich. Mar. 16, 2017).................................................17

*El-Hallani v. Huntington Nat'l Bank*,
  623 F. App'x 730 (6th Cir. 2015)...................................................................16, 19

*EPLET, LLC v. DTE Pontiac N., LLC*,
  984 F.3d 493 (6th Cir. 2021) .......................................................................14, 15

*In re Flint Water Cases*,
    584 F. Supp. 3d 383 (E.D. Mich. 2022) .............................................................16

*Florence Cement Co. v. Vettraino*,
    292 Mich. App. 461 (2011) .......................................................................19, 20

*Franklin Cap. Grp., LLC v. Austin Bus. Fin., LLC*,
    2022 WL 3703190 (E.D. Mich. May 12, 2022) ...................................................12

*Freightliner of Knoxville, Inc. v. DaimlerChrysler Vans, LLC*,
    484 F.3d 865 (6th Cir. 2007) .................................................................8, 20

*Gage Prod. Co. v. Henkel Corp.*,
    393 F.3d 629 (6th Cir. 2004) ................................................................23, 25

*GKN Driveline Newton LLC v. Stahl Specialty Co.*,
    2016 WL 1746012 (E.D. Mich. May 3, 2016) ...................................................16

*Green v. Ziegelman*,
    310 Mich. App. 436 (2015) .......................................................................16, 19

*Hall v. Gen. Motors Corp.*,
    229 Mich. App. 580 (Mich. Ct. App. 1998) .................................................11, 12

*Innovation Ventures, LLC v. Custom Nutrition Labs., LLC*,
    2021 WL 12255004 (E.D. Mich. Sept. 29, 2021) .......................................11, 12

*Ketchem v. Am. Acceptance, Co.*,
    641 F. Supp. 2d 782 (N.D. Ind. 2008) .............................................................15

*LePine v. Rosenbaum*,
    2020 WL 2836275 (E.D. Mich. June 1, 2020) ...................................................11

*Livonia Bldg. Materials Co. v. Harrison Constr. Co.*,
    276 Mich. App. 514 (2007) .......................................................................24

*New London Tobacco Mkt., Inc. v. Ky. Fuel Corp.*,
    44 F.4th 393 (6th Cir. 2022) .................................................................22, 23

*Newberry v. Silverman*,
    789 F.3d 636 (6th Cir. 2015) .................................................................10

*One Ethanol, LLC v. BOX BioScience, LLC*,
  622 F. Supp. 3d 568 (W.D. Mich. 2022) .............................................................24

*Overall v. Ascension*,
  23 F. Supp. 3d 816 (E.D. Mich. 2014) ................................................................7

*Police & Fire Ret. Sys. of the City of Detroit v. Leibowitz*,
  2017 WL 603551 (Mich. Ct. App. Feb. 14, 2017) .............................................16

*In re RCS Engineered Prod. Co.*,
  102 F.3d 223 (6th Cir. 1996) .................................................................1, 10, 11

*RDM Holdings, LTD v. Cont'l Plastics Co.*,
  281 Mich. App. 678 (2008) ....................................................................1, 10, 11

*SASC, LLC v. Sch. Supply Connection, Inc.*,
  2024 WL 1091799 (S.D. Ohio Mar. 13, 2024)...................................................15

*Se. Tex. Inns, Inc. v. Prime Hosp. Corp.*,
  462 F.3d 666 (6th Cir. 2006) ..............................................................................15

*Servo Kinetics, Inc. v. Tokyo Precision Instruments Co.*,
  475 F.3d 783 (6th Cir. 2007) ........................................................................15, 16

*Stratton v. Portfolio Recovery Assocs., LLC*,
  770 F.3d 443 (6th Cir. 2014), *as amended* (Dec. 11, 2014)...............................9

*Watson Carpet & Floor Covering, Inc. v. Mohawk Indus., Inc.*,
  648 F.3d 452 (6th Cir. 2011) ..............................................................................10

*Williams v. City of Grand Rapids*,
  672 F. Supp. 3d 395 (W.D. Mich. 2023).............................................................13

*Williams v. Duke Energy Int'l, Inc.*,
  681 F.3d 788 (6th Cir. 2012) ........................................................................22, 24

## Other Authorities

Fed. R. Civ. P. 9(b) ....................................................................................*passim*

E.D. Mich. L.R. 7.1(a) .............................................................................2, 9, 12, 13

## STATEMENT OF ISSUES PRESENTED

1.      Does a bankrupt subsidiary (and thus the bankruptcy trustee) own Michigan alter-ego claims against its parent company?

**Plaintiff's Answer: No.**

2.      Does the Complaint adequately allege an alter-ego breach of contract claim against Huron Capital Partners LLC?

**Plaintiff's Answer: Yes.**

3.      Does the Complaint adequately allege alter-ego fraud against Huron Capital Partners LLC?

**Plaintiff's Answer: Yes.**

4.      Does the Complaint adequately allege fraud against Michael Grunza III?

**Plaintiff's Answer: Yes.**

## CONTROLLING AND/OR MOST APPROPRIATE AUTHORITY

*In re RCS Engineered Prod. Co.*, 102 F.3d 223 (6th Cir. 1996).

*RDM Holdings, LTD v. Cont'l Plastics Co.*, 281 Mich. App. 678 (2008).

*Stratton v. Portfolio Recovery Assocs., LLC*, 770 F.3d 443 (6th Cir. 2014), *as amended* (Dec. 11, 2014).

## INTRODUCTION

Michigan expressly allows injured plaintiffs to pierce the corporate veil to reach a bankrupt company's parent when the parent has abused corporate formalities. That is precisely what Huron Capital did in this case, causing its alter ego to take on contractual commitments it had no intention of fulfilling based on fraudulent statements Defendants caused it to make and in some cases that they made themselves. Yet Defendants' motion to dismiss focuses on the fact that Huron Capital's alter ego is bankrupt and without the assets to pay its many, many creditors. That is not a defense against alter-ego liability—it is precisely the situation in which Michigan allows injured plaintiffs to go after the parent company. Contrary to Defendants' motion, this action does not seek WD Labs' assets. It is about having Defendants pay with their own assets for wrongdoing they themselves committed, misusing WD Labs as a mere instrumentality of their scheme.

Defendants wrongly assert that the alter-ego claims belong to the bankruptcy trustee, but without citing Michigan law or even Michigan's choice-of-law rules, which govern this case. But unequivocal statements by Michigan courts and the Sixth Circuit interpreting Michigan law are clear that such claims do *not* belong to the bankruptcy estate. *In re RCS Engineered Prod. Co.*, 102 F.3d 223, 225–26 (6th Cir. 1996); *RDM Holdings, LTD v. Cont'l Plastics Co.*, 281 Mich. App. 678, 704–05 (2008). Defendants' error in this regard could have been avoided had they

complied with E.D. Mich. L.R. 7.1(a)'s requirement to confer "in a manner that reasonably explains the basis for the motion and allows for an interactive process aimed at reaching agreement on the matter or those aspects of the matter that can be resolved without court intervention." They did not, which is reason enough to deny the motion in its entirety.

The remainder of Defendants' arguments do not deal with the Complaint's allegations as they are. On the very first page of their brief, they argue in bold italics "[t]hese allegations are patently false." Mot. at 1. And throughout their brief, Defendants argue that Dakota Labs' allegations are insufficient by blithely disregarding most of the factual allegations in the Complaint and substituting Defendants' own version of events. But Defendants cannot obtain dismissal by signaling that they intend to deny the allegations. Their motion should be denied.

## FACTUAL BACKGROUND

### I.    WD Labs was a mere instrumentality of Huron Capital.

Huron Capital Partners LLC ("Huron Capital") misused its subsidiary, M7D Corporation d/b/a WD Lab Grown Diamonds ("WD Labs"), to obtain Dakota Labs' services with no intention of paying. Compl. ¶ 1. It was aided in that fraud by Michael Grunza III, a Huron Capital partner who also served on WD Labs' board of directors and as its President and Chief Executive Officer. *Id.* ¶¶ 1, 5.

2

During the relevant periods in 2022 and 2023, WD Labs was in the business of growing lab-grown rough/uncut diamonds. Compl. ¶ 5. It was a majority-owned subsidiary of Huron Capital, which exercised complete and total control over it. *Id.* Of WD Labs' six directors, five were partners or principals of Huron Capital, including Grunza. *Id.* Grunza also served as its President and Chief Executive Officer. *Id.* WD Labs could not even enter into the contract at issue in this case without the approval of its Huron Capital-controlled board. *Id.* ¶ 14. In reality, WD Labs was a mere instrumentality of Huron Capital. *Id.* ¶ 5.

WD Labs was so badly undercapitalized that no reasonable person could believe that it could pay for the services for which it was contracting with Dakota Labs, and it predictably did not pay. Compl. ¶ 14. Indeed, by the time of its bankruptcy, it listed a little over $3 million in assets (much of which was in the form of accounts receivable owed to it) but more than $44.7 million in liabilities. *Id.*

Moreover, Defendants encouraged the perception that Huron Capital and WD Labs were so closely intertwined that Huron Capital's assets were available to pay WD Labs' debts. Compl. ¶¶ 15–16. When Dakota Labs requested financial information to assure itself that WD Labs would be able to pay, Grunza personally told Dakota Labs on April 4, 2023 that Dakota Labs had nothing to be worried about because WD Labs was backed by Huron Capital (in which Grunza himself was a partner). *Id.* ¶ 15. And when Dakota Labs expressed consternation that WD Labs

3

was not paying its invoices, WD Labs responded on April 14, 2023 with a proposed restructuring of their arrangement that involved an exchange of Huron Capital's equity, again emphasizing the lack of separation between WD Labs and its parent company, Huron Capital. *Id.* ¶ 16.

## II.   Huron Capital and Grunza caused WD Labs to enter a contract they knew it would not perform and strung Dakota Labs along with a stream of falsehoods.

In 2021, WD Labs was looking for a new company that could finish its lab-grown diamonds. Compl. ¶¶ 18–20. Dakota Labs could satisfy those needs, but only if it significantly expanded operations in Toronto. *Id.* ¶ 21. Thus, on September 1, 2022, WD Labs and Dakota Labs entered into a Collaboration Agreement under which WD Labs would pay not only for polishing services but also reimbursement for the Toronto expansion and operating costs. *Id.* ¶ 22.

As noted, WD Labs lacked the independent authority to enter into that contract without the approval of the Huron Capital partners and principals on its board, including Grunza—instruments of Huron Capital's complete control. Compl. ¶ 14. But WD Labs was in no position to perform its end of the agreement and had no intention of doing so, and both Huron Capital and Grunza knew that. *Id.* ¶¶ 14, 33. In short, Huron Capital and Grunza caused Dakota Labs to make significant expenditures on the ultimately vain promise of more than $289,000 per month in revenue for four years—all with the intention of paying nothing. *Id.* ¶¶ 33, 44–46.

Prior to entering into the Collaboration Agreement, and on a number of occasions subsequently, WD Labs represented to Dakota Labs that it would gradually be increasing the amount of carats it delivered monthly until it reached a total of 11,000 to 12,000 carats delivered to Dakota Labs each month. Compl. ¶ 37. WD Labs expected to deliver these quantities as early as October 2023. *Id.* For example, at an August 18, 2022 meeting near Washington, D.C. (before the Collaboration Agreement was signed), WD Labs' Chief Operating Officer, Caleb Wood, told Itay Ariel and Aaron Ariel that WD Labs wanted Dakota Labs to plan for a monthly production of 6,000 carats by the first quarter of 2023 and 11,000 carats by the end of the fourth quarter. *Id.* In another conversation on March 8, 2023— while (unbeknownst to Dakota Labs) WD Labs was already unable to pay for orders it was submitting to Dakota Labs—Wood reiterated WD Labs' promises, telling Itay and Aaron Ariel that WD Labs expected to process 12,000 carats by October 2023. *Id.* WD Labs was aware that these larger amounts it expected to deliver would require an expansion of Dakota Labs' Vietnam facilities beyond what was required by the Collaboration Agreement, and it made these representations to induce Dakota Labs to undertake that expansion. *Id.* In all likelihood given his position as CEO, President, and board member, Grunza directed Woods to make these representations to induce Dakota Labs to undertake that expansion as part of the scheme to keep the illusion of WD Labs' solvency alive. *Id.*

As the mounting invoices continued to go unpaid, Grunza personally intervened with yet more falsehoods to string Dakota Labs along, and he directed Wood to do the same. Compl. ¶¶ 47–51. For example, when Dakota Labs requested financial information to assure itself that WD Labs would be able to pay, Grunza told Aaron Ariel over the phone on or about April 4, 2023 that Dakota Labs had nothing to be worried about because WD Labs was backed by Huron Capital, which he described as a large private equity firm, and that it still had liquidity. *Id.* ¶ 47.

At Grunza's direction, Wood also stalled for time with a series of false statements. Compl. ¶¶ 48–51. On May 5, 2023, Wood told Itay Ariel by text message that WD Labs had approved payment to Dakota Labs, and payment would be made the following week—but no payment arrived. *Id.* ¶ 48. Again on May 13, 2023, Wood told Itay Ariel by text message that WD Labs had agreed that payment would arrive "at the latest" by May 15, 2023, and still no payment arrived. *Id.* ¶ 49.  In text messages on May 15, 2023 and May 17, 2023, Wood again assured Itay Ariel that payment would come within a week. *Id.* ¶ 50. It did not. *Id.*

In reality, Huron Capital and Grunza were simply playing for time, misrepresenting WD Labs' financial health and willingness to pay for work that Dakota Labs was doing while they prepared to deprive Dakota Labs of the ability to recoup its losses from WD Labs directly. *Id.* ¶ 52. All the while WD Labs continued delivering new diamonds for processing, even through May 2023 when its officers

6

were promising that payment for past invoices had already been approved, without intending to pay even a cent. *Id.* ¶¶ 41, 46–50, 52.

### III. Huron Capital caused WD Labs to declare bankruptcy, causing Dakota Labs to suffer an unjust loss.

Because of WD Labs' utter failure to perform its obligations under the Collaboration Agreement, Dakota Labs filed a notice of arbitration in British Columbia, Canada on July 7, 2023. Compl. ¶ 56. WD Labs had absolutely no defense to that liability. *Id.* ¶ 57. But Huron Capital had a plan to avoid its alter ego's liability—have it declare bankruptcy and open a new alter-ego company with the same leadership to do much the same thing, with Grunza still at the helm. *Id.*

Defendants began putting their plan into practice even before WD Labs declared bankruptcy, for its replacement alter ego was organized in Delaware on September 11, 2023. *See* Declaration of Ronald Y. Rothstein ("Rothstein Decl.") Exhibit A.[1] Then, on October 10, 2023, Grunza and WD Labs's Board of Directors voted to approve a Chapter 7 bankruptcy petition, which was filed the next day. Compl. ¶¶ 56, 58. Five of the six board members who voted on that resolution were partners or principals of Huron Capital. *Id.* ¶ 58.

---

[1] The Court may take judicial notice of public records in deciding a motion to dismiss. *Overall v. Ascension*, 23 F. Supp. 3d 816, 824–25 (E.D. Mich. 2014) (collecting cases).

Mere weeks later, on November 1, 2023, one of Huron Capital's co-investors in WD Labs announced that it was launching WD Advanced Materials LLC as a successor to WD Labs. Compl. ¶ 59.[2] Indeed, Huron Capital's Grunza continued in his role of CEO of this "new entity," and other key officers similarly transferred over as well. *Id.* Contrary to Defendants' suggestion, nothing in the Complaint or the press release it cites suggests this was merely an interim appointment. WD Advanced Materials is the same business with mostly the same people in control and almost the same name. *Id.* ¶¶ 60.[3]

In light of the foregoing, the reason Huron Capital and Grunza caused WD Labs to deliver diamonds to Dakota Labs for processing without any ability or intention of paying, backed by false promises that payment had already been approved and that Huron Capital was good for WD Labs' debts, is clear. The obvious

---

[2] Defendants wrongly cite paragraph 59 of the Complaint and the article it refers to as alleging that Huron Capital "has never had ownership of, and has never invested in, WDAM," Mot. at 9, but neither the Complaint nor the article says anything of the kind. Defendants' recitation of the facts contains many such misstatements of the Complaint, such as their insistence that they received no benefit from their co-investor's coordinated foreclosure on WD Labs' assets the very day they voted it into bankruptcy. *Compare* Mot. at 7 *with* Compl. ¶¶ 4, 61. But Defendants may not deny the allegations of the Complaint in moving to dismiss. *E.g.*, *Freightliner of Knoxville, Inc. v. DaimlerChrysler Vans, LLC*, 484 F.3d 865, 868 n.2 (6th Cir. 2007).

[3] Defendants claim to be unable to access the website in which WD Advanced Materials' logo actually incorporates WD Labs' name, but its new alter ego's attempts to conceal its connections to the old alter ego by taking down that webpage after the Complaint was filed do not speak to whether the Complaint states a claim for relief. A copy is attached as Rothstein Decl. Ex. B.

inference is that Huron Capital wanted to keep the illusion of its alter ego's solvency alive to forestall attempts at collection until its plan to open WD Advanced Materials in its stead was sufficiently advanced. Compl. ¶ 61.

## IV.   Defendants failed to comply with L.R. 7.1(a) before filing this motion.

The day before filing, counsel for Defendants sent a terse email stating they would move to dismiss without articulating any grounds for that motion other than that they would rely on Federal Rules of Civil Procedure ("Rules") 12(b)(6) and 9(b). Rothstein Decl. Ex. C. Defendants did not reveal the grounds of their motion until the morning of June 5, the very day they filed it, and even then they insisted that they had no obligation to do so. *Id.* Crucially, that email was the first time they indicated that they had the mistaken understanding that Dakota Labs' claims belong to WD Labs' bankruptcy trustee. *Id.*

## ARGUMENT

Defendants' motion presents an alternative set of facts to those alleged in the Complaint, but that is wholly improper. On the contrary, "[t]he plaintiff's allegations must be accepted as true, the complaint must be read as a whole, and all reasonable inferences must be drawn in the plaintiff's favor." *Stratton v. Portfolio Recovery Assocs., LLC*, 770 F.3d 443, 446 (6th Cir. 2014), *as amended* (Dec. 11, 2014) (cleaned up). Courts may not weigh whether the allegations are probable or likely, only whether the claim for relief is plausible *accepting those allegations as true*. *See*

*Watson Carpet & Floor Covering, Inc. v. Mohawk Indus., Inc.*, 648 F.3d 452, 458 (6th Cir. 2011). Accordingly, the Sixth Circuit continues to instruct that "[d]ismissal of a complaint for the failure to state a claim on which relief may be granted is appropriate only if it appears beyond a doubt that the plaintiff can prove no set of facts in support of [its] claim that would entitle [it] to relief." *Doe v. Mich. State Univ.*, 989 F.3d 418, 425 (6th Cir. 2021) (cleaned up).[4]

## I. Michigan alter-ego claims do not belong to the bankruptcy trustee.

Contrary to all applicable law, Defendants argue that the alter-ego claims belong to WD Labs' bankruptcy trustee. (Mem. 10–13.) But a Michigan alter-ego claim does not belong to the bankruptcy estate, and so the trustee lacks standing to pursue such a claim. *In re RCS Engineered Prod. Co.*, 102 F.3d 223, 225–26 (6th Cir. 1996); *RDM Holdings, Ltd. v. Cont'l Plastics Co.*, 281 Mich. App. 678, 704–05 (2008). The essential elements of such a claim require that the corporate entity have been used to commit a fraud or wrong that has injured the plaintiff, but because it is impossible to commit a fraud or wrong against oneself, "a subsidiary would never be able to satisfy the standard for disregarding corporate identity under Michigan law." *RCS Engineered Prod.*, 102 F.3d 223 at 226. So far from belonging to the

---

[4] Even if they met that high standard, Defendants' request for dismissal *with prejudice* is untenable. *See Newberry v. Silverman*, 789 F.3d 636, 646 (6th Cir. 2015) ("dismissal with prejudice and without leave to amend is not appropriate unless it is clear on de novo review that the complaint could not be saved by amendment.").

bankruptcy trustee, such claims may be brought *only* by injured third parties like Dakota Labs. *Id.* at 226; *RDM Holdings*, 281 Mich. App. at 705.

Instead of acknowledging this unambiguous Michigan law, Defendants urge the application of *Delaware* law based on *New York's* choice-of-law rules. Mot. at 11 n.7. But New York's choice-of-law rules have no applicability to this case. Federal courts sitting in diversity apply the choice-of-law rules of the forum state. *Cassirer v. Thyssen-Bornemisza Collection Found.*, 596 U.S. 107, 115 (2022). Applying Michigan rules, the internal affairs doctrine that Defendants invoke is irrelevant to alter-ego claims, for such claims are not a matter of the entities' internal affairs or the rights of their shareholders, but instead affect the rights of third parties. *See*, *e.g.*, *Innovation Ventures, LLC v. Custom Nutrition Labs., LLC*, 2021 WL 12255004, at *26 (E.D. Mich. Sept. 29, 2021). Rather, alter-ego claims are analyzed as tort claims. *E.g.*, *LePine v. Rosenbaum*, 2020 WL 2836275, at *12 (E.D. Mich. June 1, 2020). For such claims, "[f]ederal courts sitting in Michigan 'use another state's law [only] where the other state has a significant interest and Michigan has only a minimal interest in the matter.'" *Id.* (quoting *Hall v. Gen. Motors Corp.*, 229 Mich. App. 580, 585 (1998)) (alteration in original).

Defendants do not address these Michigan choice-of-law rules at all, yet those rules dictate the application of Michigan substantive law. Huron Capital is a Michigan citizen, organized under Michigan law, and headquartered in Michigan,

and its misuse of WD Labs was directed from its offices in Michigan—Michigan has more than "only a minimal interest in the matter." *Hall*, 229 Mich. App. at 585; Compl. ¶¶ 7, 10; Dkt. No. 18; *see also Innovation Ventures*, 2021 WL 12255004, at *27 ("Michigan has an interest in applying its laws to an entity whose principal place of business is located within its borders."). Indeed, Defendants themselves rely mainly on Michigan cases when reciting the elements of alter-ego liability. Mot. at 13–14. But they cannot pick and choose. Michigan law applies—full stop.

Defendants' misstep concerning ownership of alter-ego claims could have been easily avoided had they complied with E.D. Mich. L.R. 7.1(a). Indeed, their failure to do so justifies dismissing their motion without further analysis, as courts in this District frequently do. *E.g.*, *Franklin Cap. Grp., LLC v. Austin Bus. Fin., LLC*, 2022 WL 3703190 (E.D. Mich. May 12, 2022); *All About Chores LLC v. Lyon*, 2019 WL 2590750 (E.D. Mich. June 25, 2019); *see* E.D. Mich. L.R. 7.1(a)(3) (denial of motion authorized as sanction for noncompliance). The purpose of E.D. Mich. L.R. 7.1(a) "is to stimulate discussion about the dispute that is the subject of the motion in order to attempt a resolution that would not require court intervention, or in some cases to narrow the area of dispute," which ordinarily requires an actual conference. *Franklin Cap. Grp.*, 2022 WL 3703190, at *1. A perfunctory email asking if the plaintiff will oppose the requested relief does not suffice. *Id.* at *1–2; *All About Chores*, 2019 WL 2590750, at *2; *see also* E.D. Mich. L.R. 7.1 cmt.

("sending an email without engaging the other parties will not satisfy this rule"). At a minimum, Defendants' failure to comply with E.D. Mich. L.R. 7.1(a) justifies strictly enforcing the rule that they cannot raise new arguments in their reply brief. *See Williams v. City of Grand Rapids*, 672 F. Supp. 3d 395, 411–12 (W.D. Mich. 2023) (defendant cannot address proper legal standard for the first time in reply brief, even if issue was perfunctorily raised in footnote to opening brief).

Defendants cite only one Michigan case in urging that Dakota Labs' claims belong to the bankruptcy trustee, but that case says nothing of the sort. Instead, the problem in *CH Holding Co. v. Miller Holding Co.*, 973 F. Supp. 2d 733, 737–38 (E.D. Mich. 2013) was that the plaintiff was *not* bringing an alter-ego claim, notwithstanding how it was labeled, but was pursing a run-of-the-mill fraudulent transfer claim without addressing the requirements for alter-ego liability. As an earlier order in that case made clear, the problem was that the plaintiff was not attempting to pierce the corporate veil of the debtor, but of a different corporation on the sole ground that it had allegedly received fraudulent transfers. *CH Holding Co. v. Miller Parking Co.*, 903 F. Supp. 2d 551, 556–57, 559 (E.D. Mich. 2012). The debtor's owner was not a defendant. *Id.* at 556–57. In this case, however, Dakota Labs *is* seeking to pierce the corporate veil of the debtor and is suing its debtor's owner. Compl. ¶¶ 1, 62, 81. And while it is likely that Huron Capital participated in raiding the debtor's assets, this suit is not an attempt to recover those assets, and

13

Plaintiffs cite no case suggesting that an otherwise well-pleaded alter-ego claim is barred by yet further wrongdoing by the defendant with respect to the debtor.

Nor do Defendants' prudential arguments justify disregarding Michigan law. *See* Mot. at 12–13. "Faithful application of a state's law requires federal courts to anticipate how the relevant state's highest court would rule in the case" by treating decisions by the Michigan courts as binding authority, not by "adopting substantive innovation in state law." *See Berrington v. Wal-Mart Stores, Inc.*, 696 F.3d 604, 607–08 (6th Cir. 2012) (cleaned up). In any event, Defendants' policy considerations miss the point. Dakota Labs is seeking Huron Capital's assets, not WD Labs', so this action has nothing to do with the bankruptcy estate. Nor is there any risk of conflicting rulings, as a discharge of WD Labs' debts does not discharge Huron Capital's debts, and the fact that other creditors of WD Labs may also have claims against Huron Capital simply means that it faces significant liability, not that it is released from liability. Alter-ego claims are superfluous where the subsidiary can satisfy judgments against it; WD Labs' bankruptcy is the reason alter-ego claims exist, not a defense against them. *See EPLET, LLC v. DTE Pontiac N., LLC*, 984 F.3d 493, 502–03 (6th Cir. 2021) (rejecting similar arguments based on "practicality").

## II.  Huron Capital is accountable for its alter ego's breach of contract.

Dakota Labs alleges specific facts in support of each element of an alter-ego claim: "(1) the corporate entity was a mere instrumentality of another entity or

individual; (2) the corporate entity was used to commit a fraud or wrong; and (3) the plaintiff suffered an unjust loss." *Servo Kinetics, Inc. v. Tokyo Precision Instruments Co.*, 475 F.3d 783, 798 (6th Cir. 2007). Contrary to Defendants' assertion, however, Rule 9(b) applies only to alter-ego claims sounding in fraud, *Se. Tex. Inns, Inc. v. Prime Hosp. Corp.*, 462 F.3d 666, 672 (6th Cir. 2006), and thus only to Count II of the Complaint. Unlike the Tennessee law at issue in *Southeast Texas Inns*, Michigan allows alter-ego claims to be supported by "fraud *or wrong*," for which a simple breach of contract suffices. *EPLET, LLC*, 984 F.3d at 502 (emphasis added); *see also SASC, LLC v. Sch. Supply Connection, Inc.*, 2024 WL 1091799, at *3 (S.D. Ohio Mar. 13, 2024) (no heightened pleading standard where alter-ego claim not based on fraud); *Ketchem v. Am. Acceptance, Co.*, 641 F. Supp. 2d 782, 787 n.1 (N.D. Ind. 2008) (same).

Defendants do not contest (and thus concede) that Dakota Labs adequately alleged the second and third elements of its alter-ego contract claim (use for wrong, and unjust loss), instead focusing solely on the first (mere instrumentality). Mot. at 13–18. There are two problems with their limited argument. First, they improperly ask the Court to weigh evidence on a motion to dismiss. Second, in doing so, they simply disregard or controvert most of Dakota Labs' allegations.

Defendants' discussion of alter-ego liability starts on an off note which suffuses their arguments, talking about what "the Court must find" and whether the

"allegations can[] sustain a finding of alter ego liability." Mot. at 13, 16. Their arguments concern how to "weigh" various factors. *Id.* at 15, 16, 18. But the allegations do not have to "prove Plaintiff's case," only contain "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *El-Hallani v. Huntington Nat'l Bank*, 623 F. App'x 730, 739 (6th Cir. 2015) (cleaned up). There are factors that the factfinder (in this case, the jury) can consider in determining whether WD Labs was a mere instrumentality of Huron Capital, but a court does not have to consider those factors at all, even at trial. *Police & Fire Ret. Sys. of the City of Detroit v. Leibowitz*, 2017 WL 603551, at *8 (Mich. Ct. App. Feb. 14, 2017). No factor is determinative, nor are they exhaustive. *In re Flint Water Cases*, 584 F. Supp. 3d 383, 401 (E.D. Mich. 2022). Accordingly, it is not even necessary to allege each factor. *E.g.*, *GKN Driveline Newton LLC v. Stahl Specialty Co.*, 2016 WL 1746012, at *6 (E.D. Mich. May 3, 2016).

Rather, "[t]he propriety of piercing the corporate veil is highly dependent on the equities of the situation, and the inquiry tends to be intensively fact-driven. . . . each case is sui gener[is] and must be decided in accordance with its own underlying facts." *Servo Kinetics*, 475 F.3d at 798 (cleaned up). Indeed, "there is no mechanical test for determining when the existence of a separate entity must be disregarded," and "whether to disregard the separate existence of an entity depends on the totality of circumstances." *Green v. Ziegelman*, 310 Mich. App. 436, 457 (2015). But "on a

motion to dismiss, the Court cannot look at the totality of the circumstances." *In re Direct Gen. Corp. Sec. Litig.*, 398 F. Supp. 2d 888, 901 (M.D. Tenn. 2005); *see also Duby v. Shirley May's Place, LLC*, 2017 WL 1021062, at *4 (E.D. Mich. Mar. 16, 2017) (refusing to weigh totality of circumstances test on motion to dismiss).

Furthermore, Defendants concede that the Complaint alleges that Huron Capital used WD Labs "to support fraud or illegality," one of the factors that favor piercing the corporate veil. Mot. at 16. They do not say these allegations are insufficient, but rather, "[t]hese allegations cannot sustain a finding of alter ego liability ***because they are plainly untrue***." *Id.* at 16–17 (emphasis added). That forthright departure from the hornbook rule that the Court must accept Dakota Labs' allegations as true is reason enough to deny the motion.

Defendants then go on to disregard the allegations that actually tie WD Labs' actions to Huron Capital's abuse of corporate forms. Contrary to Defendants' suggestion, Dakota Labs' allegations of alter-ego liability are not based solely or even primarily on an allegation that "Huron LLC orchestrated M7D's bankruptcy and funneled assets into a new diamond company so that Huron LLC could turn a profit while shedding M7D's liabilities." Mot. at 1–2. Defendants never acknowledge the allegation that Grunza was a partner at Huron Capital and an agent of its total control over WD Labs, sitting on its Huron Capital-controlled board and serving as its President and CEO. Compl. ¶¶ 8, 13–15, 47, 58. In a gross

understatement, Defendants claim that "not all" of WD Labs' directors and officers held positions with Huron Capital, Mot. at 16, when in fact every single director save one was a Huron Capital partner or principal. Compl. ¶ 13. They disregard the fact that WD Labs' officers lacked the authority to enter into the Collaboration Agreement—only the Huron Capital partners who sat on the board could do so. *Id.* ¶¶ 13–14. That allegation negates Defendants' claim that Dakota Labs does not allege that they participated in executing that agreement—their approval was required. *See* Mot. at 4. Defendants tellingly do not discuss any of these allegations in asserting that the Complaint shows nothing more than an ordinary parent-subsidiary relationship between Huron Capital and WD Labs. *See id.* at 15–16 (discussing factors of honoring corporate formalities and sham).

Defendants also promise to explain why Dakota Labs' allegations fail to satisfy Rule 9(b) (which, again, would apply only to Count II), Mot. at 17–18, but the promised "Section E" never made it into their brief. Nor do they discuss all of the fraudulent statements that Huron Capital caused WD Labs to make in addressing whether the "fraud or illegality" factor is adequately alleged. *See* Compl. ¶¶ 15–16, 33, 37, 61, 76, 84.

Defendants' suggestion that Dakota Labs "fails to even conclusory allege" that WD Labs was undercapitalized, Mot. at 14, is absurd in light of the clear allegation that "WD Labs was severely undercapitalized" and "no reasonable person could

have believed that WD Labs was sufficiently capitalized to perform its obligations," Compl. ¶ 14.[5] Defendants instead take issue with when undercapitalization is to be judged—based exclusively on cases that did not apply Michigan law. Mot. at 14. But Michigan courts also look to insolvency at the time of contracting in assessing undercapitalization in alter-ego cases. *E.g.*, *Green*, 310 Mich. App. at 442; *Florence Cement Co. v. Vettraino*, 292 Mich. App. 461, 472 (2011). Given that WD Labs immediately fell behind on its invoices before entering bankruptcy with liabilities that grossly exceeded its assets, Dakota Labs has raised a reasonable inference that it was undercapitalized at the time of contracting. Compl. ¶¶ 14, 43–46, 48–50.

Similarly, Defendants' treatment of allegations suggesting that Huron Capital and WD Labs commingled their finances boils down to the claim that Dakota Labs has not proven its case. Mot. at 15; *see El-Hallani*, 623 F. App'x at 739 (plaintiff need not prove case on motion to dismiss). And Defendants' treatment effectively concedes that the allegations *do* speak to the second and third instrumentality factors. But Defendants downplay and misstate those allegations. Grunza's April 4, 2023 statement did not concern the sort of vague "back[ing]" that every private equity firm provides to its portfolio companies, but instead was an assurance that *WD Labs*

---

[5] Defendants' quotation of this allegation alters it to give the false impression that the Complaint claimed only that WD Labs was undercapitalized by the time of its bankruptcy, rather than at the time of contracting. Mot. at 14.

could pay its bills because of *Huron Capital's* financial health. Compl. ¶¶ 15, 47. Similarly, WD Labs offered to restructure *its own debts* using *Huron Capital's* assets. *Id.* ¶ 16. The companies did not treat their debts and assets as separate, and "where members do not treat an artificial entity as separate from themselves, neither will [a Michigan] Court." *Florence Cement*, 292 Mich. App. at 470.

Instead of addressing the Complaint's allegations, Defendants attempt to shift focus toward denying that they coordinated WD Labs' implosion with Huron Capital's co-investor or that Huron Capital even owed WD Labs at all. Mot. at 2, 6–7, 8–9, 16–17. But a defendant's denial of the Complaint's allegations is improper on a motion to dismiss. *Freightliner of Knoxville, Inc. v. DaimlerChrysler Vans, LLC*, 484 F.3d 865, 868 n.2 (6th Cir. 2007).

In any event, Defendants' attempt to distance Huron Capital from Tree Line backfires, as the bankruptcy petition they attach to support their contention that Tree Line's foreclosure drove WD Labs into bankruptcy instead highlights the intimate coordination between the two. The Huron Capital-controlled board approved filing that petition—which with schedules runs to 83 pages—on very same day that Tree Line commenced its foreclosure. Dkt. No. 16-1 at PDF pp. 8–14. It was filed the very next day because it was ready to go due to precisely the sort of coordination that the Complaint alleges. *See* Compl. ¶¶ 52, 57, 59–60. Tree Line had the successor corporation set up and ready to go a month before WD Labs even filed for

bankruptcy. WD Labs' petition lists Tree Line as a control person. Dkt. No. 16-1 at PDF p. 62. In light of the Complaint's allegations, Defendants' insistence that WD Labs' filing for bankruptcy actually establishes "respect for corporate formalities" sufficient to justify dismissal is tone deaf. Mot. at 16.

Defendants try to cast doubt on the Complaint's allegations by saying that Huron Capital is not WD Labs' owner and never even held equity in it, acknowledging only that an affiliate made an equity investment. Mot. at 2, 16 n.8; *see* Compl. ¶ 13. But it bears noting that the very bankruptcy petition Defendants attach to their motion identifies Huron Capital as WD Labs' sole owner, Dkt. No. 16-1 at PDF p. 62, as does Huron Capital's own website, Rothstein Decl. Ex. D. And Defendants' insinuation that Huron Capital should not be held liable for an abuse of corporate forms because it engaged in that abuse through yet another alter ego instead highlights its abuse of corporate forms.

Further information concerning WD Labs' finances and organization is exclusively in Defendants' control, of course. At this stage, Dakota Labs need only "raise a reasonable expectation that discovery will reveal evidence of illegal [conduct]." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). It has done so.

## III. Dakota Labs adequately alleges each Defendant's fraud.

With respect to allegations of fraud, the Sixth Circuit has stated that "Rule 9(b) does not require omniscience; rather the Rule requires that the

circumstances of the fraud be pled with enough specificity to put defendants on notice as to the nature of the claim." *Williams v. Duke Energy Int'l, Inc.*, 681 F.3d 788, 803 (6th Cir. 2012) (cleaned up). That is because "it is a principle of basic fairness that a plaintiff should have an opportunity to flesh out [its] claim through evidence unturned in discovery." *Id.* "Especially in a case in which there has been no discovery, courts have been reluctant to dismiss the action where the facts underlying the claims are within the defendant's control." *Id.* Accordingly, fraud may be alleged on information and belief where the facts are peculiarly within the perpetrator's knowledge, so long as the foundations of that belief are alleged. *United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 501 F.3d 493, 512 (6th Cir. 2007). Dakota Labs has done so.

The Complaint lays out the content of each fraudulent statement, who made it, when it was made, to whom, how it fit into Defendants' fraudulent scheme, and the injury Dakota Labs suffered from detrimental reliance on it. Compl. ¶¶ 33, 37–40, 47–52, 61, 84–86, 92–99; *see New London Tobacco Mkt., Inc. v. Ky. Fuel Corp.*, 44 F.4th 393, 410–11 (6th Cir. 2022) (Rule 9(b) requirements). Defendants' statements to the contrary simply disregard the allegations of the Complaint.

Given that Counts II and III are each identified as alleging "Fraud in the Inducement," it is bizarre that Defendants argue that four of the five statements that underlie the fraud claim against Huron Capital (which also form part of the claim

against Grunza) "are simply descriptions of [WD Labs'] execution of the agreement and subsequent performance." Mot. at 19; *see* Compl. ¶¶ 84, 92. But promises of future action "made in bad faith without intention of performance" are actionable as fraud. *Gage Prod. Co. v. Henkel Corp.*, 393 F.3d 629, 645 (6th Cir. 2004). *DBI Investments, LLC v. Blavin,* 617 F. App'x 374, 382 (6th Cir. 2015), on which Defendants rely, merely reiterates that such deception must occur at the time the promise is made, not that subsequent actions cannot shed light on intent at the time the contract is made. And the Complaint clearly alleges that the Collaboration Agreement was signed with no present intention of performance and that diamonds were repeatedly delivered for processing with no present intention of paying for those services. Compl. ¶¶ 4, 33, 84, 92. It supports those allegations concerning Defendants' intention with the fact that WD Labs could not possibly have performed its obligations. *Id.* ¶¶ 4, 14.

As for the fifth statement (concerning expected volume), Defendants concede that it can form the foundation of a fraudulent inducement claim. Mot. at 19. But they pretend that the only such statement occurred after the Collaboration Agreement was signed—they are bizarrely silent about Wood's August 18, 2022 statements; Compl. ¶ 37—and they invoke Rule 9(b) to request details about Wood's March 8, 2023 statement that Rule 9(b) does not require. Mot. at 20–21.

But Rule 9(b) does not require that a plaintiff plead the internal machinations

that led a corporate employee to make a false statement. *See New London Tobacco Mkt.*, 44 F.4th at 410–11 (Rule 9(b) requirements).[6] Moreover, Dakota Labs stated the basis of its belief that Defendants were the motive force behind the falsehoods alleged—Huron Capital exerted total control over WD Labs through Grunza and the other Huron Capital personnel who dominated its board, and the Collaboration Agreement could not proceed without their participation. Compl. ¶¶ 2, 13–16. "Officers of a corporation may be held individually liable when they personally cause their corporation to act unlawfully." *Livonia Bldg. Materials Co. v. Harrison Constr. Co.*, 276 Mich. App. 514, 519 (2007). It is an entirely reasonable inference that a subordinate like Wood acts at the behest of superiors who are directly involved in the events. That is more than enough to put Defendants on notice of the particulars of the fraud. "Rule 9(b) does not require omniscience." *Williams*, 681 F.3d at 803.

And the problem with Defendants' arguments about Wood's March 8, 2023 misrepresentation is that it *did* go beyond the volumes required under the Collaboration Agreement, necessitating expansion in Vietnam, as well. "Claims of fraud extraneous to the contract are permissible." *DBI Invs.*, 617 Fed. App'x at 382

---

[6] Defendants do not contest that Wood's false representations that payment had been approved can support a claim for fraud, only whether Grunza's involvement was adequately alleged. Mot. at 22. Courts permit claims of fraud based on dishonest promises to pay in order to continue obtaining goods and prevent the other side from defending its rights in event of breach. *E.g.*, *One Ethanol, LLC v. BOX BioScience, LLC*, 622 F. Supp. 3d 568, 579–80 (W.D. Mich. 2022).

(cleaned up). Wood's statement was fraudulent because WD Labs had no such intention when the representation was made. *Gage Prod.*, 393 F.3d at 645.

The same goes for Defendants' argument that Grunza's extra-contractual assurance that Huron Capital stood ready to pay WD Labs' debts was not a pre-contractual representation. Mot. at 23–24. And Defendants cite no authority suggesting that Huron Capital's willingness and ability to make Dakota Labs whole constitutes a "mere expression[] of opinion" on Grunza's part. *Id.* at 23. On the contrary, it was a clear statement of fact that was false when it was uttered. And given that Huron Capital now resists making Dakota Labs whole, it is risible that Defendants question how the Complaint alleges that statement was false. *Id.* at 14.

## CONCLUSION

Defendants' desire to deny the allegations of the Complaint does not render those allegations insufficient. Their motion to dismiss should be denied.

Dated: June 26, 2024        Respectfully submitted,

WINSTON & STRAWN LLP

*/s/ Ronald Y. Rothstein*
Ronald Y. Rothstein
RRothste@winston.com
35 West Wacker Drive
Chicago, Illinois 60601
Telephone: 312-558-7464

*Attorneys for Dakota Labs Inc.*

25