UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DAKOTA LABS INC.,

     Plaintiff,      Case No. 2:24-cv-10922

v.             Honorable Susan K. DeClercq
              United States District Judge

HURON CAPITAL PARTNERS LLC
and MICHAEL GRUNZA III,

      Defendants.
_____/

**ORDER DENYING DEFENDANTS' MOTION TO DISMISS (ECF No. 16)**

   In September 2022, two companies, Plaintiff Dakota Labs and nonparty WD Labs, contracted to collaborate in the manufacturing, processing, and finishing of lab-grown diamonds. In 2023, this business relationship deteriorated, and Dakota Labs claimed that WD Labs breached its contract. However, WD Labs is currently in Chapter 7 bankruptcy proceedings in Delaware. So, instead of suing WD Labs directly, Dakota Labs sued one of WD Labs' investors—Defendant Huron Capital—and Defendant Michael Grunza, who served as a partner at Huron Capital, a member of WD Labs' board of directors, and WD Labs' CEO. Dakota Labs asserts two claims against Huron Capital—breach of contract and fraud in the inducement—under the theory that WD Labs is Huron Capital's alter ego, and one claim for fraud

in the inducement against Grunza. As explained below, the motion to dismiss will be denied.

## I. BACKGROUND

The following factual allegations come from Dakota Labs' complaint, ECF No. 1. At the motion-to-dismiss stage, its allegations must be accepted as true, and all reasonable inferences must be drawn in its favor. *See Lambert v. Hartman*, 517 F.3d 433, 439 (6th Cir. 2008).

Nonparty WD Labs is a Delaware corporation in the business of producing rough lab-grown diamonds. ECF No. 1 at PageID.5. In 2021, WD Labs started looking for a North American facility to manufacture and polish its diamonds, making them fit for sale to consumers. *Id.* at PageID.5–6; ECF No. 16 at PageID.78.

Around the time WD Labs began its search, nonparty Crossworks Manufacturing Ltd. owned two such diamond polishing facilities: one large facility in Vietnam and one small facility in Toronto. ECF No. 1 at PageID.6.

But WD Labs was specifically looking for North American processing facilities to decrease the processing time for their diamonds. *Id*. And Crossworks' Toronto facility was too small for WD Labs' needs. *Id.* So WD Labs and Crossworks reached a mutually beneficial agreement under which WD Labs would send its diamonds to Crossworks' Vietnam facility to "allow Crossworks to be in a financial position to establish and operate a North American facility to service WD Labs'

specific needs" by expanding their Toronto facility. *Id.*

Around the time WD Labs and Crossworks worked out this arrangement, Crossworks formed Dakota Labs Inc. "to separate the lab grown diamond business" from "Crossworks' natural diamond business." *Id.* Dakota Labs was officially incorporated and headquartered in British Columbia, Canada, in July 2022. *Id.* at PageID.3, 6.

After Dakota Labs formation, WD Labs and Dakota Labs entered into a Collaboration Agreement in September 2022, which formalized the "mutually beneficial agreement" WD Labs and Crossworks had reached. *Id.* at PageID.6.

Under their contract, WD Labs would send rough diamonds to the Vietnam facility and, once the expansion was complete, to the Toronto facility. *Id.* At those facilities, Dakota Labs would manufacture and finish the diamonds to be consumer ready. *Id.* Dakota Labs was to be responsible for the up-front costs of expansion, but WD Labs would make monthly reimbursement payments toward those expenses after the expansion was completed. *Id.* at PageID.6–7. Dakota Labs claims that this meant that, under the contract, WD Labs was responsible for $109,417 per month for the Toronto renovation expenses, plus about $180,000 per month in processing costs out of the Vietnam facility. *Id.* at PageID.11.

Consistent with its obligations under the contract, Dakota Labs completed the Toronto facility expansion in 2023 and notified WD Labs that it had done so. *Id.* In

addition to the Toronto facility expansion, Dakota Labs spent more than $990,000 to expand the operations of its Vietnam facility, doing so based on WD Labs' representations that it would increase the volume of its orders at both facilities. *Id.* at PageID.11–12.

From January to March of 2023, WD Labs sent rough diamonds to Dakota Labs for finishing according to the terms of the Collaboration Agreement. *Id.* at PageID.13. But in April 2023, WD Labs did not send any diamonds to Dakota Labs, which violated the Collaboration Agreement. *Id.* at PageID13–14. Nevertheless, WD Labs sent rough diamonds to Dakota Labs again in May 2023. *Id.* at PageID.13.

In February 2023 Dakota Labs began issuing monthly invoices to WD Labs for its finishing services and its Toronto facility expansion. *Id.* at PageID.14. But WD Labs never paid these, making "only token payments on unrelated invoices as a delaying tactic." *Id.* at PageID.14.

Concerned that WD Labs was unable to pay, Dakota Labs requested additional financial information as assurances in April 2023. *Id.* at PageID.14. In response, Defendant Michael Grunza, WD Labs' CEO, said on the phone that Dakota Labs had nothing to worry about because WD Labs was backed by Defendant Huron Capital, a large private equity firm. *Id.* at PageID.14–15. And later that month, WD Labs responded to Dakota Labs' concerns with a "proposed

- 4 -

restructuring of their arrangement that involved an exchange of Huron Capital's equity." *Id.* at PageID.5.

In May 2023, Caleb Woods, WD Labs' Chief Operating Officer, told Dakota Labs four different times in two weeks that payment was forthcoming. *Id.* at PageID.15. Dakota Labs alleges that Grunza directed each of these assurances to be made. *Id.* But no payment ever arrived. *Id.* And after May 2023, WD Labs never sent any more diamonds to Dakota Labs for finishing. *Id.*

Dakota Labs provided written notice of WD Labs' breach of the Collaboration Agreement in mid-May. *Id.* Then, after the two companies failed to reach a solution, Dakota Labs wrote to WD Labs to terminate their contract in September 2023. *Id.*

Less than a month later, WD Labs filed for Chapter 7 Bankruptcy in Delaware. *Id.*; *see also In re M7D Corporation*, No. 23-11699 (Bankr. D. Del). The WD Labs Board approved the filing in a vote, and five of the six board members who voted in favor were partners or principals of Defendant Huron Capital, including Grunza. *Id.* at PageID.16. Shortly after, an investor in WD Labs announced that it was launching a new diamond company, "WD Advanced Materials LLC." *Id.* The announcement acknowledged its predecessor, WD Labs, and identified Grunza, the former CEO of WD Labs, as the CEO of the new entity. *Id.*

On April 9, 2024, Dakota Labs sued Huron Capital and Grunza, alleging fraud in the inducement and breach of contract. *Id.* at PageID.18–23. Pointing to Grunza's

assurances that WD Labs had Huron Capital's backing, and the fact that many of WD Labs's board members (including Grunza) were partners at Huron Capital, Dakota Labs alleges that Huron Capital used WD Labs as an alter ego and instituted bankruptcy proceedings to avoid paying its creditors, including Dakota Labs. *Id.* Defendants moved to dismiss under Civil Rule 12(b)(6), arguing that Dakota Labs failed to state a claim and that the alter ego claims are barred by the bankruptcy case pending in Delaware. ECF No. 16. After receiving full briefing on the motion, ECF Nos. 20; 23, this Court ordered supplemental briefing on the underlying contract's forum-selection and choice-of-law clauses, as well as other choice-of-law issues presented in the original briefs. ECF No. 25. The Parties filed supplemental briefs on these issues. ECF Nos. 27; 28.

## II. STANDARD OF REVIEW

Under Civil Rule 12(b)(6), a pleading fails to state a claim if its allegations do not support recovery under any recognizable legal theory. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In considering a Rule 12(b)(6) motion, the court accepts the complaint's factual allegations as true and draws all reasonable inferences in the plaintiff's favor. *See Lambert*, 517 F.3d at 439 (6th Cir. 2008).

The complaint is sufficient if it "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. If not, then the court must grant the motion to

dismiss. *Winnett v. Caterpillar, Inc.*, 553 F.3d 1000, 1005 (6th Cir. 2009). When a complaint alleges fraud, or when a cause of action seeks to pierce the corporate veil on the basis of fraud, "the circumstances constituting fraud . . . [must] be stated with particularity." *Se. Tex. Inns, Inc. v. Prime Hosp. Corp.*, 462 F.3d 666, 672 (6th Cir. 2006) (citations omitted).

## III. ANALYSIS

### A. Choice of Law

Both types of claims at issue here—breach of contract and fraud in the inducement—are premised on state law, so there is a threshold question of which state's laws should govern. For almost all the issues, the Parties agree that Michigan law applies. ECF Nos. 27 at PageID.292; 28 at PageID.318–19. But they disagree over which state's law should apply to one issue: whether alter ego claims belong to the bankruptcy trustee. ECF Nos. 27 at PageID.283; 28 at PageID.308. In other words, does the applicable state law allow Dakota Labs to sue Huron Capital outside of WD Labs's pending bankruptcy proceedings?

To determine this, the Court must use the choice-of-law rules of Michigan, the forum state. *Olenik v. Ohio Cas. Ins. Co.*, 114 F.4th 821, 825 (6th Cir. 2024). Generally, the task of resolving any conflict of laws proceeds in three steps: (1) determine the forum state's choice-of-law principles; (2) decide whether the competing rules present a true or false conflict; and (3) if a true conflict exists, apply

the relevant principles to resolve the conflict. *See In re FCA US LLC Monostable Elec. Gearshift Litig.*, 598 F. Supp. 3d 639, 648 (E.D. Mich. 2022).

### 1. Michigan's Choice-of-Law Principles

This Court must first identify the forum state's relevant choice-of-law principles. Although alter ego claims are based in equity, they have "elements of fraud" and are treated as torts for choice-of-law purposes. *Lim v. Miller Parking Co.*, 548 B.R. 187, 203–04 (E.D. Mich. 2016) (citing *Muglia v. Kaumagraph Corp.*, 64 F.3d 663 (6th Cir. 1995) (unpublished table decision)).

Therefore, Michigan's choice-of-law principles for torts apply. Those rules dictate that courts should apply Michigan law unless a "rational reason" to do otherwise exists. *Sutherland v. Kennington Truck Serv., Ltd.*, 562 N.W.2d 466, 471 (Mich. 1997). "In determining whether a rational reason to displace Michigan law exists, [courts] undertake a two-step analysis. First, [courts] must determine if any foreign state has an interest in having its law applied. If no state has such an interest, the presumption that Michigan law will apply cannot be overcome. If a foreign state does have an interest in having its law applied, [courts] must then determine if Michigan's interests mandate that Michigan law be applied, despite the foreign interests." *Id.* But before applying Michigan's choice-of-law rules, this Court must first consider whether there is truly a conflict between any potential states' laws in this case. *See In re FCA US LLC*, 598 F. Supp. 3d at 648.

*2. Conflict Between Competing Rules*

The next step in the choice-of-law inquiry is determining whether there is a "false conflict" between the laws of the forum state and another state. *In re FCA US LLC*, 598 F. Supp. 3d at 648. "A false conflict exists where the laws of the interested jurisdictions are: (1) the same; (2) different but would produce the same outcome under the facts of the case; or, (3) when the policies of one jurisdiction would be furthered by the application of its laws while the policies of the other jurisdiction would not be advanced by the application of its laws." *Id.* at 649 (quoting *Salinero v. Johnson & Johnson*, 408 F. Supp. 3d 1354, 1357 (S.D. Fla. 2019)).

With respect to alter ego claims: in some states, like Delaware, alter ego claims belong to the bankruptcy trustee. This means that only the bankruptcy trustee may assert alter ego claims; any other entity would be barred from doing so. *See, e.g.*, *In re Maxus Energy Corp.*, 571 B.R. 650, 658 (Bankr. D. Del. 2017); *Harrison v. Soroof Int'l, Inc.*, 320 F. Supp. 3d 602, 627 (D. Del. 2018). This is the rule Huron Capital argues for, because it would result in Dakota Labs' alter ego claims being dismissed. ECF No. 23 at PageID.246–47.

But in other states, like Michigan, alter ego claims do *not* belong to the bankruptcy trustee, so third parties may litigate their own claims outside of the bankruptcy proceedings. *See, e.g.*, *In re RCS Engineered Prods. Co., Inc.*, 102 F.3d 223, 227 (6th Cir. 1996) (applying Michigan law); *RDM Holdings, Ltd. v. Cont'l*

*Plastics Co.*, 762 N.W. 2d 529, 545 (Mich. Ct. App. 2008). This is the rule Dakota Labs argues for, because it would permit its claims to continue here. ECF No. 20 at PageID.209–13.

The different states' laws would reach different results, so there is a true conflict. Dakota Labs argues the conflict is false, though, because not *all* alter ego claims belong to the bankruptcy trustee in Delaware. ECF No. 27 at PageID.285. Rather, these claims belong to the bankruptcy trustee only if the claims are "general," "with no particularized injury arising from it." *Harrison*, 320 F. Supp. 3d. at 619 (quoting *In re Emoral, Inc.*, 740 F.3d 875, 879 (3d Cir. 2014)). By contrast, a "specific" claim is personal to the creditor if "other creditors generally have no interest in that claim." *Emoral*, 740 F.3d at 879. In other words, if WD Labs's other creditors could come forward with the exact same claim, it is a general one, and Delaware law would bar individual entities (like Dakota Labs) from suing WD Labs (or Huron Capital) outside of the bankruptcy proceedings.

Dakota Labs argues that because its claims are *specific*, in that they are based on misrepresentations made only to Dakota Labs, Delaware law would not prevent its suit and thus any conflict is false. ECF No. 27 at PageID.286–88 However, Delaware law evaluates the uniqueness of the *alter ego* claim, not of the underlying fraud or breach claim. *Harrison*, 320 F. Supp. 3d at 619 (citing *Emoral, Inc.*, 740 F.3d at 879). Here, the alter ego claim is general: Dakota Labs alleges that Huron

Capital undercapitalized WD Labs, attracted business for it, then made WD Labs declare bankruptcy to avoid paying its debts. ECF No. 1 at PageID.4, 16. Nothing about *that* claim is specific to Dakota Labs, and in fact, any of WD Labs' creditors could allege the same. *See Harrison*, 320 F. Supp. 3d at 621. As such, applying Delaware law to the alter ego claim here *would* preclude Dakota Labs' suit against Huron Capital. *See id.* at 627. Thus, there is a true conflict between Michigan and Delaware law.

### 3. Application of Michigan's Choice-of-Law Rules for Torts

Because a true conflict exists here, the next step is to apply Michigan's choice-of-law principles to determine which state's laws should control. *In re FCA US LLC*, 598 F. Supp. 3d at 648. As discussed above, Michigan's principles require courts to ask whether "any foreign state has an interest in having its law applied. If no state has such an interest, the presumption that Michigan law will apply cannot be overcome. If a foreign state does have an interest in having its law applied, [the court] must then determine if Michigan's interests mandate that Michigan law be applied, despite the foreign interests." *Sutherland*, 562 N.W.2d at 471.

Beginning with the first question, several states have an interest in having their law applied. Dakota Labs is a Canadian company, incorporated under the laws of British Columbia. ECF No. 1 at PageID.3. WD Labs, the only other named party to the contract, is a Delaware corporation. *See* ECF Nos. 1 at PageID.6; 16 at

PageID.78. Huron Capital is a Michigan-based LLC. ECF No. 1. Michael Grunza is a Texas resident. *Id.* Therefore, the potentially interested states are British Columbia, Delaware, Michigan, and Texas. *See* ECF Nos. 1; 16. Further, the contract between Dakota Labs and WD Labs includes a choice-of-law clause indicating that the laws of British Columbia and Canada govern it. ECF No. 1-1 at PageID.35.

But because the Parties only argue that either Michigan or Delaware law should apply—not British Columbia or Texas law—this Court will focus its analysis only on the relative interests of Michigan and Delaware.[1] *See* ECF Nos. 27; 28. Both Delaware and Michigan have an interest in applying their laws, but for different reasons. Huron Capital is a Michigan company, and Michigan has an interest in its companies honoring their contracts and conducting business without fraud. This interest is especially relevant in this case, given that Dakota Labs alleges that Huron Capital acted fraudulently from its offices *in Michigan*. ECF No. 27 at PageID.290. On the other hand, WD Labs, the party to the underlying contract with Dakota Labs, was incorporated in Delaware and has a pending bankruptcy case in Delaware. *See* ECF No. 28 at PageID.315. As such, Delaware has an interest in having its laws

---

[1] In its Order directing supplemental briefing, this Court noted four states—Michigan, Delaware, British Columbia, and Texas—with potential interests. ECF No. 25. But the Parties chose to focus on two states only: Michigan and Delaware. ECF Nos. 27; 28. Given how explicitly the Court presented these four options, the Court can only conclude that the Parties intentionally abandoned any argument in favor of Texas or British Columbia law. So any such arguments are deemed waived. *Bannister v. Knox Cnty. Bd. of Educ.*, 49 F.4th 1000, 1011–12 (6th Cir. 2022).

applied to prevent fraudulent activity by its businesses, both in and out of the bankruptcy context.[2] But in the end, the actual fraud claim Dakota Labs pursues in this case is not *bankruptcy* fraud but fraud in the inducement, which lessens Delaware's interest. *See* ECF No. 1.

In sum, the facts and claims in this case are no more related to the state of Delaware than they are to Michigan. And under Michigan's choice-of-law rules, where Michigan and another state have an equal interest in applying their laws, or where Michigan's interest is greater, Michigan law applies. *Sutherland*, 562 N.W.2d at 471; *Hall v. Gen. Motors Corp.*, 582 N.W.2d 866, 868 (Mich. Ct. App. 1998) (noting that courts applying Michigan law "use another state's law [only] where the other state has a significant interest and Michigan has only a minimal interest in the matter); *see also Lim*, 548 B.R. at 204.

---

[2] Defendants insist that Delaware law should apply in part because "courts routinely apply the law of the state of the debtor's incorporation to determine whether alter ego claims belong to a trustee in bankruptcy." ECF No. 23 at PageID.246. But they fail to identify any instance in which a court applying Michigan law has adopted that choice-of-law principle. *Id.*; *see also* ECF No. 28 at PageID.314. To the contrary, Michigan's choice-of-law rules do not look to the state of incorporation as determinative. *Cf. Chrysler Corp. v. Ford Motor Co.*, 972 F. Supp. 1097, 1103 (E.D. Mich. 1997) (determining that under Michigan choice-of-law principles, "the law of the state of incorporation is not entitled to preference on successor liability issues"). Rather, courts applying Michigan law have applied Michigan's choice-of-law rules for torts to alter ego claims. *See Lim*, 548 B.R. at 203–04. Accordingly, this Court will resolve the conflict of laws with Michigan's choice-of-law principles for torts.

Thus, because Michigan's interests are at least as great as Delaware's, the Court will apply the law of the forum—Michigan law—to the question of whether alter ego claims belong to the bankruptcy trustee. And under Michigan law, alter ego claims are not property of the bankruptcy trustee. *In re RCS Engineered Prods. Co.*, 102 F.3d 223, 226 (6th Cir. 1996). Therefore, Dakota Labs is not barred from bringing its alter ego claims outside of the bankruptcy proceedings. *Id.*

## B. Alter Ego Liability

Defendants next argue that Dakota Labs has failed to allege enough facts to make it plausible that Huron Capital used WD Labs as its alter ego. ECF No. 16 at PageID.89. For this reason, Defendants argue that they cannot be assigned blame for WD Labs' actions.

Assigning alter ego liability to a parent company or investor is a form of corporate veil-piercing, which is an equitable remedy that is "sparingly invoked." *EPLET, LLC v. DTE Pontiac N., LLC*, 984 F.3d 493, 499 (6th Cir. 2021). It is rare, in part, because "Michigan law presumes that the corporate form will be respected." *Id.* (citing *Servo Kinetics, Inc. v. Tokyo Precision Instruments Co.*, 475 F.3d 783, 798 (6th Cir. 2007)). Therefore, Michigan courts will not assign alter ego liability unless "(1) the corporate entity was a mere instrumentality of another entity or individual; (2) the corporate entity was used to commit a fraud or wrong; and (3) the plaintiff suffered an unjust loss." *Id.* (quoting *Servo Kinetics*, 475 F.3d at 798); *see*

*also RDM Holdings*, 762 N.W.2d at 550–51. In addition to fraud, "Michigan courts have held that a breach of contract can be the kind of wrong that justifies piercing a corporate veil if the corporate form has been abused." *EPLET*, 984 F.3d at 499 (collecting cases).

Michigan courts have also identified a non-exhaustive list of factors that may be considered in determining whether an entity is a mere instrumentality of another:

> (1) whether the corporation is undercapitalized;
> (2) whether separate books are kept;
> (3) whether there are separate finances for the corporation;
> (4) whether the corporation is used for fraud or illegality;
> (5) whether corporate formalities have been followed; and
> (6) whether the corporation is a sham.

*In re Flint Water Cases*, 584 F. Supp. 3d 383, 401 (E.D. Mich. 2022) (quoting *Glob. Consulting DM Fenton Assocs., LLC v. DHTE Grp.*, LLC, No. 353133, 2021 WL 941066, at *4 (Mich. Ct. App. Mar. 11, 2021)). Michigan courts have also considered factors like the comingling of funds and the extent to which the shareholder controlled the decisions of the entity. *Id.* (quoting *Think Operations, LLC v. Top Shelf Barber Supplies, LLC*, No. 1:19-CV-752, 2021 WL 21597, at *8 (W.D. Mich. Jan. 4, 2021)).

Here, Dakota Labs claims that Huron Capital used WD Labs as an alter ego, specifically alleging that: (1) WD Labs was a mere instrumentality of Huron Capital, *id.* at PageID.18; (2) Huron Capital personnel exercised complete control over WD Labs, *id.* at PageID.19; (3) WD Labs was a majority-owned subsidiary of Huron

Capital, *id.* at PageID.4; (4) of WD Labs' six directors, five were partners or principals of Huron Capital, including WD Labs' President and CEO, Grunza, *id.*; (5) WD Labs was severely undercapitalized,[3] *id.*; (6) Grunza made assurances that WD Labs was able to pay its contractual obligations because it was backed by Huron Capital, *id.* at PageID.4–5; and (7) WD Labs proposed restructuring its agreement with Dakota Labs to exchange equity in Huron Capital, *id.* at PageID.5. Further, Dakota Labs made detailed allegations that the corporate entity (WD Labs) was used to commit a fraud or wrong, *id.* at PageID.20, and that Dakota Labs suffered an unjust loss as a result, *id.*

These allegations are enough at this stage to plead alter ego liability against Huron Capital. True, the existence of a parent-subsidiary relationship is not enough to create alter ego liability. *See Ford Motor Co. v. Centra, Inc.*, No. 349212, 2020 WL 4248471 (Mich. Ct. App. July 23, 2020) (citing *Bourne v. Sanford*, 41 N.W.2d 515, 522 (1950)) ("The fact that a corporate entity is wholly owned by another entity is insufficient, by itself, to establish abuse of the corporate form."). And alleging a

---

[3] Defendants argue that this allegation is insufficient because "a plaintiff must sufficiently allege that it was inadequately capitalized at the time of its organization." ECF No. 16 at PageID.90. But in support of this assertion, they only cite non-binding opinions from other district courts, none of which apply Michigan law. *Id.* As the Parties conceded, the elements of alter ego liability in this case are dictated by Michigan law. ECF Nos. 27 at PageID.292; 28 at PageID.318. Finding no reason to believe *Michigan* law requires a higher pleading standard for undercapitalization, this Court will not impose such a requirement.

corporation is a "mere instrumentality" of another corporation may be a legal conclusion. But Dakota Labs has alleged enough facts beyond that relationship to survive a motion to dismiss. Specifically, that WD Labs was undercapitalized, run by a board of almost entirely Huron Capital partners, and that Huron Capital's name was invoked several times by WD Labs officials during the contract dispute. Taken together, these facts provide a sufficient basis to make that conclusion plausible at the motion-to-dismiss stage.

### B. Breach of Contract Claim Against Huron Capital

Aside from challenging the sufficiency of Dakota Labs' alter ego claims, Defendants do not argue that Dakota Labs failed to state a claim for breach of contract. *See generally* ECF No. 16. Thus, Dakota Labs' breach of contract claim against Huron Capital will remain.

### C. Fraud in the Inducement Claim Against Huron Capital

Huron Capital also challenges the claim against it for fraud in the inducement, both on the alter ego theory and on the merits. ECF No. 16 at PageID.89, 94. As discussed above, Dakota Labs has sufficiently pled alter ego liability, so all that is left to address is whether Dakota Labs has sufficiently alleged fraud in the inducement.

To state a claim for fraud in the inducement under Michigan law, plaintiffs must allege that: "(1) the defendant made a material representation; (2) the

representation was false; (3) when the defendant made the representation, the defendant knew that it was false, or made it recklessly, without knowledge of its truth and as a positive assertion; (4) the defendant made the representation with the intention that the plaintiff would act upon it; (5) the plaintiff acted in reliance upon it; and (6) the plaintiff suffered damage." *Rooyakker & Sitz, P.L.L.C. v. Plante & Moran, P.L.L.C.*, 742 N.W.2d 409, 420 (Mich. Ct. App. 2007) (citation omitted).

Further, fraud in the inducement "redresses misrepresentations that *induce* the buyer to enter into a contract *but that do not in themselves* constitute contract or warranty terms subsequently breached by the seller." *Uhl v. Komatsu Forklift Co., Ltd*, 512 F.3d 294, 304 (6th Cir. 2008) (quoting *Huron Tool & Eng'g Co. v. Precision Consulting Servs., Inc.*, 532 N.W.2d 541, 546 (Mich. Ct. App. 1995)) (emphasis added). The representations must either induce the plaintiff to *enter* the contract or induce reliance *beyond* the terms of the contract (effectively creating a new agreement). *See Huron Tool & Eng'g*, 532 N.W.2d at 546 ("plaintiff may only pursue a claim for fraud in the inducement extraneous to the alleged breach of contract"). To hold otherwise would "turn[] *every* breach-of-contract claim into a claim for fraud in the inducement, because every party enters into an agreement with the expectation that all parties will abide by the agreement's terms." *Id.* at 305.

Additionally, Civil Rule 9(b) requires that fraud claims—including fraud in the inducement—must  be pled with particularity. But the Sixth Circuit has also held

that "it is a principle of basic fairness that a plaintiff should have an opportunity to flesh out her claim through evidence unturned in discovery." *Williams v. Duke Energy Int'l, Inc.*, 681 F.3d 788, 803 (6th Cir. 2012). For this reason, "Rule 9(b) does not require omniscience; rather the Rule requires that the circumstances of the fraud be pled with enough specificity to put defendants on notice as to the nature of the claim." *Id.*

Here, Dakota Labs alleges that Huron Capital, through its alter ego WD Labs, made several material misrepresentations. ECF No. 1 at PageID.21. It further alleges that: (1) Huron Capital made these representations knowing them to be false or recklessly disregarding their truth; (2) the representations were made with the intention that Dakota Labs would act on them; (3) Dakota Labs acted in reasonable reliance on these representations, expanding its Vietnam Facility beyond the requirements of the contract; and (4) Dakota Labs was harmed by that reliance. *Id.*

Although these four statements mirror the elements of a fraud in the inducement claim, *Rooyakker & Sitz*, 742 N.W.2d at 420, the relevant question here is whether Dakota Labs' *factual allegations* support a fraud in the inducement claim. Specifically, Dakota Labs alleges that Huron Capital, through WD Labs, made 5 material representations to induce Dakota Labs' reliance:

(a)   It represented to Dakota Labs that it intended to increase the volume of its orders to 11,000 to 12,000 carats by the end of October 2023, despite knowing at the time that it had no intention of doing so.

- 19 -

(b)     It entered into the Collaboration Agreement, despite knowing at the time that it had no intention of performing its obligations under that contract.

(c)     It delivered diamonds for processing in February 2023, despite knowing at the time that it had no intention of paying for that processing.

(d)     It delivered diamonds for processing in March 2023, despite knowing at the time that it had no intention of paying for that processing.

(e)     It delivered diamonds for processing in May 2023, despite knowing at the time that it had no intention of paying for that processing.

ECF No. 1 at PageID.21.

Importantly, the last four allegations merely describe the signing and partial performance of the contract. *Id.*; *see also* ECF No. 1-1. Thus, those allegations are not "extraneous" to the contract and are not actionable as fraud in the inducement under Michigan law. *Huron Tool & Eng'g*, 532 N.W.2d at 546.

As for the remaining allegation that WD Labs told Dakota Labs it intended to increase the volume of its orders despite knowing it would not, that representation is only *partly* actionable as fraud in the inducement under Michigan law. Although Dakota Labs describes the representation as a single statement, it actually refers to two separate statements by WD Labs' Chief Operating Officer, Caleb Woods in August 2022 and March 2023. ECF No.1 at PageID.12, 20.

- 20 -

Woods' August 2022 statement does not give rise to a fraud in the inducement claim because his statement became a contract term. Indeed, Woods told Dakota Labs officers on August 18, 2022, that WD Labs wanted them to "plan for a monthly production of 6,000 carats by the first quarter of 2023 and 11,000 carats by the end of the fourth quarter." *Id.* And Woods' statement about increasing to 11,000 carats per month became a contract term. ECF No. 1-1 at PageID.39. As such, Dakota Labs may not proceed on a fraud in the inducement claim based on that representation. *Uhl*, 512 F.3d at 304.

But Woods' March 2023 statement does give rise to a fraud in the inducement claim. Dakota Labs alleges that on March 8, 2023, Woods told Dakota Labs that WD Labs would increase the size of its orders to *12,000* carats per month—which is beyond the volume contemplated in the contract. ECF No. 1 at PageID.12. And Dakota Labs further claimed that it reasonably relied on this representation to expand the operations of the Vietnam facility. *Id.* To the extent that Dakota Labs alleges that it detrimentally relied upon *this* representation by Woods—which went beyond the terms of the contract—Dakota Labs states a claim for fraud in the inducement. *Rooyakker & Sitz*, 742 N.W.2d at 420. And despite Defendants' arguments to the contrary, these "promises of future action" are actionable when, as Dakota Labs alleges, "they were made in bad faith without intention of performance." *Gage*

*Prods. Co. v. Henkel Corp.*, 393 F.3d 629, 645 (6th Cir. 2004) (quoting *Hi-Way Motor Co. v. Int'l Harvester Co.*, 247 N.W.2d 813, 816 (1976)).

In sum, Dakota Labs has sufficiently alleged all the elements of fraud in the inducement as to the March 2023, representation by Woods on behalf of WD Labs, so the claim against Huron Capital arising out of Woods' March 2023 statements may proceed. But any fraud in the inducement claims based on the other four representations Dakota Labs alleges WD Labs made, *see* ECF No. 1 at PageID.21, may not proceed against Huron Capital.

### D. Fraud in the Inducement Claim Against Michael Grunza

In Count III, Dakota Labs alleges that Grunza directed WD Labs to make the same material misrepresentations that were alleged in Count II, as well as four other misrepresentations. ECF No. 1 at PageID.22.

To the extent that Dakota Labs' fraud in the inducement claim against Grunza is based on the same misrepresentations alleged in Count II, it will be narrowed in the same way as it was in Count II, and for the same reasons. *See* Part III.C., *supra*. Accordingly, the claim may proceed to the extent it is based on the allegation that Grunza directed Woods to make the March 2023 statement.

Defendants respond that Grunza may not be held liable for Woods' March 2023 statement because the complaint fails to state with particularity *how* Grunza directed Woods to make that statement. ECF No. 16 at PageID.98. But at this stage,

the allegations are enough to "place[] the defendant on sufficient notice of the misrepresentation allowing the defendants to answer, addressing in an informed way plaintiff's claim of fraud," which satisfies Civil Rule 9(b). *Llewellyn-Jones v. Metro Prop. Grp., LLC*, 22 F. Supp. 3d 760, 781 (E.D. Mich. 2014) (quoting *Coffey v. Foamex L.P.*, 2 F.3d 157, 162 (6th Cir.1993)) (cleaned up); *see also Williams*, 681 F.3d at 803 (discouraging dismissal "where the facts underlying the claims are within the defendant's control"). Dakota Labs may at least proceed to discovery on this claim, which will shed light on Grunza's involvement—or lack thereof.

Beyond the same misrepresentations that were alleged in Count II, Dakota Labs also alleges that Grunza is liable for four other misrepresentations:

(1)   Grunza directed WD Labs[] to sign the Collaboration Agreement knowing at the time that WD Labs had no intention of performing its obligations under that contract or in reckless disregard of that fact and intending for Dakota Labs to rely on those promises.

(2)   Grunza represented to Dakota Labs that WD Labs' debts to it were backed by Huron Capital, knowing that statement to be false or in reckless disregard of its truth and intending for Dakota Labs to rely on that representation.

(3)   Grunza directed Woods to represent that WD Labs had approved payment for overdue invoices, knowing that statement to be false or in reckless disregard of its truth and intending for Dakota Labs to rely on that representation.

(4)   Grunza directed Woods to represent that WD Labs would pay overdue invoices, knowing that statement to be false or in reckless disregard of its truth and intending for Dakota Labs to rely on that representation.

ECF No. 1 at PageID.23. Dakota Labs alleges that based on these representations, it expanded the Vietnam facility beyond what was required by the contract, signed the contract, performed on the contract, and held off on seeking relief from the breach before WD Labs declared bankruptcy. *Id.*

Again, Dakota Labs may proceed on only those fraud claims that are not duplicative of the terms and performance of the contract between Dakota Labs and WD Labs. *See* Part III.C., *supra*. Therefore, Dakota Labs may not proceed with its claims to the extent that it seeks to hold Grunza liable for fraud in the inducement for directing WD Labs, his own company, to sign the contract. Nor may it proceed on the theory that the "detrimental reliance" by Dakota Labs was merely the signing and performance of the contract. Fraud in the inducement claims do not stretch so far. *See Uhl*, 512 F.3d at 304.

But reading the complaint in the light most favorable to Dakota Labs, it alleges that Grunza's financial assurances, either from Grunza or Woods (at Grunza's direction), induced Dakota Labs to act *beyond* the terms of the contract by expanding its Vietnam facility. *See* ECF No. 1 at PageID.23. At the motion-to-dismiss stage, these allegations are enough for Dakota Labs' fraud in the inducement claim against Grunza to proceed. However, to the extent that this claim is based upon representations (direct or indirect) meant to induce Dakota Labs to do something

already required under the contract, Dakota Labs will be barred from pursuing such theories of its claim. *See Uhl*, 512 F.3d at 304.

In sum, the motion to dismiss Count III will be denied—though Dakota Labs may proceed with its claim only to the extent it seeks remedies for statements made to induce actions beyond the terms of the Collaboration Agreement.

## VI. CONCLUSION

Accordingly, it is **ORDERED** that Defendants' Motion to Dismiss, ECF No. 16, is **DENIED.**

**This is not a final order and does not close the above-captioned case.**


<span style="text-align:right">*/s/Susan K. DeClercq*     
SUSAN K. DeCLERCQ
United States District Judge</span>

Dated: March 24, 2025